# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GRAND SLAM CLUB / OVIS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **vs.** | } | **CASE NO. 2:06-cv-4643-SLB** |
| | } | |
| **INTERNATIONAL SHEEP HUNTERS ASSOCIATION FOUNDATION, INC.,** *a former California corporation sometimes d/b/a ISHA*; **FOUNDATION FOR NORTH AMERICA WILD SHEEP,** *an Iowa corporation sometimes d/b/a FNAWS,* | } } } } } } } } } } } | |
| | } | |
| **Defendants.** | } | |

| | |
|---|---|
| **INTERNATIONAL SHEEP HUNTERS ASSOCIATION FOUNDATION, INC.,** *a former California corporation sometimes d/b/a ISHA*; **FOUNDATION FOR NORTH AMERICA WILD SHEEP,** *an Iowa corporation sometimes d/b/a FNAWS,* | } } } } } } } } } |
| | } |
| **Counter-claimants,** | } |
| | } |
| **vs.** | } |
| | } |
| **GRAND SLAM CLUB / OVIS,** | } |
| | } |
| **Counter-defendant.** | } |

## MEMORANDUM OPINION

This case is currently before the court on a number of post-judgment motions, including defendant International Sheep Hunters Association Foundation, Inc. ("ISHA") and defendant Foundation for North American Wild Sheep's ("FNAWS") (collectively the "Defendants") Post-Judgment Motions Pursuant to Rules 60 and 62 of the Federal Rules of Civil Procedure, (Doc. 249), Defendants' Post-Judgment Motions Pursuant to Rules 50 and 59, (Doc. 259), their Motion to Strike, (Doc. 280), and finally their Motion to Vacate, Alter, or Amend Order of August 5, 2009 Regarding Posting of Bond to Require Defendants to Post Separate Bonds, (Doc. 301).[1]  Also before the court are plaintiff Grand Slam Club/OVIS's ("GSCO") Motion for an Award of its Attorneys' Fees, (Doc. 256), and its Petition for Costs of Suit, (Doc. 258).

Having carefully reviewed and considered the materials in the court file, including the trial transcript and exhibits, the jury instructions, the special jury verdict form, the parties' briefs, oral argument of counsel, and the relevant law, the court finds as follows: Defendants' Post-Judgment Motion Pursuant to Rule 60, (Doc. 249), is due to be denied, Defendants' Post-Judgment Motion Pursuant to Rule 62, (Doc. 249), is due to be denied as moot, Defendants' Post-Judgment Motion Pursuant to Rule 50, (Doc. 259), is due to be denied, Defendants' Post-Judgment Motion Pursuant to Rule 59, (Doc. 259), is due to be denied, Defendants' Motion to Strike, (Doc. 280), is due to be denied, Defendants' Motion to Vacate,

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

Alter, or Amend Order of August 5, 2009 Regarding Posting of Bond to Require Defendants to Post Separate Bonds, (Doc. 301), is due to be denied, GSCO's Motion for an Award of its Attorneys' Fees, (Doc. 256), is due to be denied, and GSCO's Petition for Costs of Suit, (Doc. 258), is due to be granted in part and denied in part.

## I.  <u>FACTUAL AND PROCEDURAL BACKGROUND</u>[2]

Plaintiff GSCO describes itself (as well as its claimed predecessor, "The Grand Slam Club") as a sheep hunting conservation and record keeping organization that documents and bestows awards for certain defined criteria.[3]  (Doc. 25 at 4-6, ¶¶ 10-14.)  Defendant FNAWS describes itself as a Wyoming non-profit corporation, incorporated in 1977.  (Doc. 37 at 29-30, ¶¶ 1-4.)  Specifically, FNAWS has the partial mission "to promote and enhance increasing populations of indigenous wild sheep, to safeguard against their decline or extinction, and to fund programs for the professional management of these populations." (*Id.* at 30, ¶ 4.)  Defendant ISHA describes itself as "an international record keeping and conservation organization for sheep and goat hunters," which has been operating as a

---

[2] A more detailed factual and procedural background is available in the court's Findings and Conclusions, entered contemporaneously herewith pursuant to Defendants' request under Fed. R. Civ. P. 52.  Indeed, the factual and procedural background detailed here is in part adopted from those Findings and Conclusions.

[3] For example, GSCO bestows a "Grand Slam of North American Wild Sheep" award to "an individual hunter [who] takes one each of the four different North American wild sheep," specifically the Dall, Stone, Rocky Mountain Bighorn, and Desert Bighorn.  (Doc. 25 at 4, ¶ 10; Doc. 311 at 13:19-25.)

California non-profit corporation since 1975.  (*Id.* at ¶¶ 5-6.)  In 2005, FNAWS and ISHA combined their operations.  (*Id.* at ¶ 7.)

For many years, GSCO and FNAWS worked together, with GSCO regularly participating in FNAWS' annual conventions.  (Doc. 234 at 13, ¶ 14.)  In 1995, GSCO and FNAWS operated collaboratively under a written agreement, which was renewable for additional years (the "1995 Agreement").  (*See* Pl.'s Trial Ex. 85.)  But, the parties' cooperative alliance deteriorated, and GSCO decided not to renew the 1995 Agreement for the 2005 year, evidenced by GSCO's notification letter, dated February 26, 2004. (*See* Def.'s Trial Ex. 115.)

GSCO began to believe that FNAWS was unlawfully infringing its common law intellectual property, and in response, on August 4, 2004, filed trademark and service mark registration applications for the marks: GRAND SLAM, GRAND SLAM OF NORTH AMERICAN WILD SHEEP, OVIS WORLD SLAM, CAPRA WORLD SLAM, 3/4 GRAND SLAM, and 3/4 SLAM.[4]  (*See* Pl.'s Trial Exs. 1, 2, 3, 4, 5 & 240; Doc. 234 at 13, ¶ 13.)  GSCO also sent FNAWS a cease and desist letter, dated September 23, 2004, informing FNAWS of GSCO's claimed intellectual property rights and pending applications, and requesting that FNAWS cease and desist from further use of the marks.  (Pl.'s Trial Ex. 240.)  FNAWS opposed the registration applications, specifically filing Notices of

---

[4] Both parties have also indicated that the marks 3/4 GRAND SLAM, 3/4 SLAM, OVIS WORLD SLAM and CAPRA WORLD SLAM are derivatives of the GRAND SLAM and GRAND SLAM OF NORTH AMERICAN WILD SHEEP marks.  (Doc. 252 at 11; Doc. 274 at 1 n.1.)

4

Opposition on October 25, 2005 as to the marks GRAND SLAM, GRAND SLAM OF NORTH AMERICA WILD SHEEP, 3/4 GRAND SLAM, and 3/4 SLAM. (See Pl.'s Trial Exs. 162, 163, 164 & 165.)

Thereafter, in an effort to reach an understanding of each other's respective intellectual property, GSCO and FNAWS entered into "An Agreement of Goodwill" (the "2005 Agreement") on June 13, 2005. (Pl.'s Trial Ex. 41.) The 2005 Agreement stated in part that "FNAWS will release GSCO and discharge any and all claims arising out of their relationship established by any prior written agreements between the two organizations." (*Id.* at 1.) Additionally, the agreement noted that "GSCO and FNAWS agree . . . to request permission to the use of one another's Intellectual Property." (*Id.*) Finally, the 2005 Agreement specified that "[GSCO] agrees that the Foundation for North American Wild Sheep (FNAWS) is free to use its trademark filing number 78-462159 [i.e. the mark "GRAND SLAM OF NORTH AMERICAN WILD SHEEP"] for the purpose of recognizing their members." (*Id.* at 2; Doc. 25 at 7, ¶ 19.)

On July 25, 2006 and August 29, 2006, GSCO obtained federal service mark and trademark protection for its OVIS WORLD SLAM and GRAND SLAM marks, respectively. (Pl.'s Trial Exs. 1 & 4.)

The 2005 Agreement did not resolve the parties' disagreements and GSCO sent FNAWS a second cease and desist letter, dated October 5, 2006. (Pl.'s Trial Ex. 47.) The second letter likewise did not resolve the disagreements. (*See* Doc. 1.)

On November 9, 2006, GSCO filed its initial Complaint against Defendants.  (Doc. 1.)  The case was assigned to Judge Virginia Emerson Hopkins.

Thereafter, on February 6, 2007 and March 20, 2007, GSCO obtained federal service mark protection for its marks CAPRA WORLD SLAM and GRAND SLAM, respectively. (Pl.'s Trial Exs. 2 & 5.)

In part to reflect the federally issued service marks, GSCO filed an Amended Complaint on April 5, 2007.  (*See* Doc. 23; Doc. 25.)  The Amended Complaint alleged seven separate counts against Defendants, including (1) federal trademark infringement and dilution, (2) federal false designation of origin, (3) common law trademark and service mark infringement and unfair competition under the laws of Alabama, (4) breach of the 2005 Agreement, (5) tortious interference with business relations, (6) copyright infringement, and (7) likelihood of injury to business reputation or of dilution under state law.  (Doc. 25 at 15-24, ¶¶ 40-82.)  Specifically, the Amended Complaint alleged that Defendants infringed GSCO's claimed marks "GRAND SLAM, OVIS WORLD SLAM, CAPRA WORLD SLAM, GRAND SLAM OF NORTH AMERICAN WILD SHEEP, 3/4 SLAM, and 3/4 GRAND SLAM," as well as GSCO's "copyrighted CAPRA WORLD SLAM and OVIS WORLD SLAM documents."[5]  (*See id.* at 8, ¶ 23.)

---

[5] GSCO obtained federal copyright protection for the OVIS WORLD SLAM and CAPRA WORLD SLAM documents on October 30, 2006 and December 11, 2006, respectively.  (Pl.'s Trial Exs. 8 & 13.)

Defendants filed their final Amended Answer on May 21, 2007.  (Doc. 37.)  In the Amended Answer, Defendants set forth multiple affirmative defenses, including laches, acquiescence, unclean hands, and abandonment.  (*Id.* at 20, ¶ 2, 29, ¶ 35.)  Defendants also alleged multiple counterclaims against GSCO, including Count Three, which seeks to cancel GSCO's trademark registrations pursuant to section 14 of the Lanham Act, codified at 15 U.S.C. § 1119.  (*See id.* at 42, ¶¶ 55-61.)

Following extensive litigation, the case proceeded to trial, which commenced on January 22, 2008.  (*See* Doc. 311 at 1.)  At the conclusion of the seven day jury trial, Judge Hopkins instructed the jury on the law that it must follow and apply in deciding the case. (Doc. 234 at 1.)  Judge Hopkins also provided the jury with a special verdict form, consisting of twenty-one interrogatories set out in four sections.  (*See* Doc. 235.)  Following deliberations, on January 31, 2008, the jury returned a verdict in favor of GSCO and against Defendants on all claims, and awarding GSCO a monetary judgment in the amount of $1.9 million.[6]  (*Id.*)

At a conference with the parties that same day, Judge Hopkins stated that she would publish the jury verdict, but would not enter judgment until after deciding the still unresolved issues that might affect the judgment, including Defendants' remaining affirmative defenses and cancellation counterclaim, which Judge Hopkins had reserved for determination.  (*See*

---

[6] The jury also awarded GSCO $100,000 for its breach of contract claim against FNAWS. (Doc. 235 at Question III.A.3.)  However, the parties agreed that those damages were duplicative and unrecoverable.  (*See* Doc. 239 at 1-2.)

Doc. 308 at 160-65.)  Judge Hopkins gave the parties ten days to file their motions, and then four days to respond.[7]  (*Id.* at 162-63.)

Defendants did not file a motion or brief within ten days.  (*See* Doc. 241 at 3 n.1.) GSCO, however, filed a Motion for Entry of Permanent Injunction and for Discharge and Release of Bond on February 5, 2008.  (Doc. 237.)  Judge Hopkins, regarding GSCO's motion, entered an order the next day requiring that GSCO email a proposed permanent injunction to the chambers inbox; the order also stated that "Defendants' response to Plaintiff's Motion should address, among other things, any specific objections to Plaintiff's proposed order, along with any supportive pinpointed controlling case authority."  (Doc. 238.)  Thereafter, on February 13, 2008, GSCO filed a Motion for Entry of Judgment, requesting that judgment be entered in the amount of $1.9 million dollars, and also requesting that the court enter its proposed permanent injunction set out in its earlier Motion for Entry of Permanent Injunction.  (*See* Doc. 239.)  The following day, on February 14, 2008, Defendants filed a Post-Verdict Brief regarding, *inter alia*, their remaining affirmative defenses and cancellation counterclaim.  (Doc. 240.)

Subsequently, on February 15, 2008, Judge Hopkins entered Judgment in favor of GSCO and a Permanent Injunction against Defendants.  (Doc. 242.)  Accompanying that

---

[7] Judge Hopkins "specifically warned the parties that the days were 'real' days, not days as computed under Fed. R. Civ. P. 6."  (*See* Doc. 308 at 162:23-163:19; Doc. 241 at 3.)  Both GSCO and Defendants specifically agreed to the deadline.  (*See* Doc. 308 at 163:13-14, 17-19; Doc. 241 at 3.)  Therefore, according to the schedule, the parties had until February 10, 2008 to file motions or briefs affecting judgment on the jury's verdict, and an additional four days to respond to any of the opposing party's filings.

filing, Judge Hopkins entered a Memorandum Opinion in which she recognized that Defendants filed a Post-Verdict Brief on February 14, 2008, but stated that the brief was untimely and therefore not considered. (Doc. 241 at 3 n.1.) Judge Hopkins noted, however, that "the court's entry of judgment should not be construed as ruling on the merits of [their Post-Verdict Brief]," and that Defendants "may still make all post-judgment motions as are permitted under the Federal Rules of Civil Procedure." (*Id.*)

After the parties filed multiple post-judgment motions, Judge Hopkins recused herself from the case. (*See* Doc. 283.) The case was subsequently reassigned to the undersigned. (*See id.*)

Thereafter, on May 21, 2009, this court ordered the parties "to brief the issue of how they believe[d] this court should proceed with the case." (Doc. 290.) GSCO filed a Brief Supporting Certification of the Record on September 28, 2009. (Doc. 314.) Defendants filed their Brief in Support of Necessity of New Trial on November 6, 2009. (Doc. 323.) GSCO filed a reply on November 20, 2009.[8] (Doc. 324.)

On July 31, 2009, GSCO filed an Expedited Motion for Bond, requesting that the court order Defendants to post a supersedeas bond in the full amount of the $1.9 million judgment. (Doc. 293 at 1-2.) The court granted that motion on August 4, 2009, and denied

---

[8] Evidenced in footnote 11 of the court's contemporaneously filed Findings and Conclusions, this court has certified familiarity with the record and has further determined that the case may be completed without prejudice to the parties, as required by Fed. R. Civ. P. 63.

Defendants' subsequent Motion for Reconsideration.  (Doc. 294; Doc. 295; Doc. 296; Doc. 297.)  Defendants posted the bond on August 28, 2009.  (Doc. 310.)

Finally, pursuant to Defendants' request under Fed. R. Civ. P. 52, this court entered, contemporaneously with this Memorandum Opinion, Findings of Fact and Conclusions of Law regarding Defendants' affirmative defenses and cancellation counterclaim.[9]  In those Findings and Conclusions, the court rejected Defendants' affirmative defenses and determined that the counterclaim was due to be denied.

## II.  DISCUSSION

### A.    DEFENDANTS' MOTION PURSUANT TO FED. R. CIV. P. 60(b) (DOC. 249)

Pursuant to Fed. R. Civ. P. 60(b)(1) and (6), Defendants filed a motion "for relief from the judgment and permanent injunction" in favor of GSCO.  (Doc. 249 at 3.)  In the motion, Defendants argue that the "[e]ntry of judgment was improper because the Court had not yet ruled on Defendants' cancellation counterclaim or their affirmative defenses."  (*Id.*)  Defendants also state that they "were not permitted to file a timely response to the Motion for Entry of Judgment," that the court "should consider defendants' Post-Verdict Brief and Opposition to the Motion for Permanent Injunction" despite their late filings, and that "[t]he

_____

[9] As noted in footnote 10 of the court's Findings and Conclusions, to the extent Judge Hopkins considered the Memorandum Opinion, (Doc. 241), or Final Judgment and Permanent Injunction, (Doc. 242), to include findings of fact and conclusions of law, the court considers its Findings and Conclusions to constitute amended or additional findings pursuant to Fed. R. Civ. P. 52(b).

permanent injunction entered by the Court contains serious legal and logistical flaws, is

unworkable and is therefore due to be altered, amended or vacated." (*Id.* at 3-4.)  Defendants

also filed an accompanying brief in support of their motion.  (Doc. 250.)  Thereafter, GSCO

filed their Opposition to Defendants' Post-Judgment Motion Pursuant to Rule 60(b), (Doc.

275), and Defendants filed a reply to GSCO's Opposition.  (Doc. 276.)

1.     <u>STANDARD OF REVIEW UNDER RULE 60(b)</u>

Rule 60(b) of the Federal Rules details the grounds on which a court, exercising its

discretion, can rescind or amend a final judgment or order.  The rule states:

> On motion and just terms, the court may relieve a party or its legal representative
> from a final judgment, order, or proceeding for the following reasons:
> **(1)**     mistake, inadvertence, surprise, or excusable neglect;
> **(2)**     newly discovered evidence that, with reasonable diligence, could not have
>             been discovered in time to move for a new trial under Rule 59(b);
> **(3)**     fraud (whether previously called intrinsic or extrinsic), misrepresentation, or
>             misconduct by an opposing party;
> **(4)**     the judgment is void;
> **(5)**     the judgment has been satisfied, released or discharged; it is based on an
>             earlier judgment that has been reversed or vacated; or applying it
>             prospectively is no longer equitable; or
> **(6)**     any other reason that justifies relief.

Fed. R. Civ. P. 60(b).  The United States Court of Appeals for the Eleventh Circuit has noted

that Rule 60(b) "should be construed in order to do substantial justice, but this does not mean

that final judgments should be lightly reopened."  *Griffin v. Swim-Tech Corp.*, 722 F.2d 677,

680 (11th Cir. 1984) (internal citation omitted).  Instead, "[t]he provisions of this rule must

be carefully interpreted to preserve the delicate balance between the sanctity of final

11

judgments and the 'incessant command of the court's conscience that justice be done in light of *all* the facts.'" *Id.* (quoting *Bankers Mortgage Co. v. United States*, 423 F.2d 73, 77 (5th Cir. 1970)).

Here, Defendants specifically request relief under subsections (1) and (6).  (Doc. 249 at 3-4.)  Rule 60(b)(1), which in part allows relief for "excusable neglect," including "situations in which the failure to comply with a filing deadline is attributable to negligence," is an equitable determination "taking account of all relevant circumstances surrounding the party's omission."  *Pioneer Invest. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 394-95 (1993).  The Supreme Court of the United States has noted that relevant circumstances "include the danger of prejudice to the [opposing party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith."  *Id.*  Rule 60(b)(6), which allows relief for "any other reason that justifies relief," "is a broadly drafted umbrella provision which has been described as 'a grand reservoir of equitable power to do justice in a particular case when relief is not warranted by [subsections (1) through (5)].'"  *Griffin*, 722 F.2d at 680 (quoting 7 J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 60.27[2] (2d ed. 1982)).  That said, "[a] motion pursuant to Rule 60(b)(6) must 'demonstrate that the circumstances are sufficiently extraordinary to warrant relief.  Even then, whether to grant the requested relief is . . . a matter for the district court's

sound discretion." *Ramsey v. Walker*, 304 F. App'x 827, 828 (11th Cir. 2008) (quoting *Toole*

*v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1317 (11th Cir. 2000)).

2.    DEFENDANTS' ARGUMENTS UNDER RULE 60(b)

Defendants first argue, in Part II.A of their brief in support of their Rule 60(b) motion,

that "[e]ntry of judgment was improper because the Court had not yet ruled on defendants'

counterclaim for cancellation or defendants' equitable affirmative defenses."  (Doc. 250 at

2.)  Nevertheless, this court has entered Findings and Conclusions contemporaneously with

this Memorandum Opinion, which rule on Defendants' cancellation counterclaim and

equitable affirmative defenses.[10]  Therefore, Judge Hopkins's failure to enter findings and

conclusions is harmless; Defendants' argument is moot. *See* Fed. R. Civ. P. 61 (noting that

"[a]t every stage of the proceeding, the court must disregard all errors and defects that do not

affect any party's substantial rights").

Next, in Part II.B of their brief, Defendants contend that they "were not permitted to

file a timely response to the Motion for Entry of Judgment."  (*Id.* at 4.)  Additionally,

Defendants claim that GSCO's Motion for Entry of Judgment was itself untimely based on

Judge Hopkins's post-verdict briefing schedule, and also wrongfully stated "that there were

---

[10] As noted in footnote 10 of the court's Findings and Conclusions, to the extent Judge Hopkins considered the Memorandum Opinion, (Doc. 241), or Final Judgment and Permanent Injunction, (Doc. 242), to include findings of fact and conclusions of law, this court considers its own Findings and Conclusions to constitute amended or additional findings pursuant to Fed. R. Civ. P. 52(b).

no further issues to be decided" despite Defendants' remaining equitable counterclaim and defenses.[11]  (*Id.*)  First, addressing Defendants' argument that GSCO's motion erroneously stated "there were no further issues to be decided" is moot because, as discussed above, this court has contemporaneously filed findings of fact and conclusions of law, which rule on Defendants' cancellation counterclaim and equitable defenses.  Second, Judge Hopkins's post-verdict briefing schedule applied only to issues that the court needed to consider prior to entering judgment on the jury's verdict.  (*See* Doc. 308 at 160-65.)  GSCO's Motion for Entry of Judgment, however, merely notified the court that Defendants had not timely filed any post-verdict motions or briefs, and thus moved the court for entry of judgment; the motion was therefore not subject to the post-verdict briefing schedule and was not untimely. (*See* Doc. 239 at 3, ¶¶ 6-7.)  Finally, as to Defendants' argument that they "were not permitted to file a timely response to the Motion for Entry of Judgment," (Doc. 250 at 4), the court agrees with GSCO that the argument is unavailing, (*see* Doc. 275 at 5 n.1).  Indeed, Judge Hopkins already addressed this argument on multiple occasions, and each time rejected it.  (*See* Doc. 241 at 2, Doc. 253.)  And, at any rate, in order to enter judgment on the jury's verdict, the court did not need for GSCO to file a motion for entry of judgment, let alone need a response from Defendants.  In fact, Judge Hopkins had only delayed entering

---

[11] Defendants also argue in Part II.B of their brief that "the verdict contains a double recovery which was, in any event, due to be corrected prior to entry of judgment."  (Doc. 250 at 5.)  But, as Defendants recognize, they repeat this argument in their Post-Judgment Motion Pursuant to Rule 59, and discuss it in considerably more detail.  (*See id.*; Doc. 259 at 4.)  For that reason, the court reserves addressing the issue until its discussion regarding Defendants' Rule 59 motion.  *See infra* Part II.D.2.a.(3).

judgment due to the parties' joint request, so that they could brief any remaining and unresolved issues.[12]  (*See* Doc. 241 at 2.)

In Part II.C of their brief, Defendants claim, pursuant to Fed. R. Civ. P. 60(b)(1), that the court should excuse their untimely filed post-verdict submissions because "[a]ny delay . . . was due to . . . excusable neglect." (Doc. 250 at 5.)  Defendants' late filings include their Post-Verdict Brief, (Doc. 240), as well as their Opposition to Plaintiff's Motion for Entry of Permanent Injunction, (Doc. 244).   As discussed above, the relevant considerations concerning the "excusable neglect" prong of Rule 60(b)(1) include: "the danger of prejudice to the [opposing party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer Invest. Servs. Co.*, 507 U.S. at 394-95.  First, as GSCO argues and Defendants admit, Defendants failure to timely file any motions or briefs affecting the entering of judgment on the jury's verdict was wholly "within the reasonable control of [Defendants]." (*See* Doc. 275 at 3-5; Doc. 250 at 7.) Second, despite Defendants arguments in Part II.D of their brief that they will suffer "severe" prejudice if the court denies their motion, the court finds otherwise.  (*See* Doc. 250 at 10.) Simply put, all of the arguments Defendants made in their two untimely filed briefs, (Doc.

---

[12]  Alternatively, the court does not consider Defendants' inability to file a response to GSCO's Motion for Entry of Judgment to constitute "circumstances . . . sufficiently extraordinary to warrant relief" under Rule 60(b)(6), *Ramsey*, 304 F. App'x at 828 (quoting *Toole*, 235 F.3d at 1317), in part because, as GSCO points out, Defendants did not call Judge Hopkins's chambers to advise the court of their intention to oppose the motion, despite Judge Hopkins's Scheduling Order, which specifically advises parties to do so, (Doc. 34 at 6).  (*See* Doc. 245 at 5, ¶ 12.)

240, Doc. 244), are either made in their post-judgment motions and accompanying briefs which the court has considered, or rendered moot by the court's contemporaneously filed Findings and Conclusions.[13]  (*See, e.g.*, Doc. 250 at 12; Doc. 260; Doc. 261; Doc. 264.)

Lastly, in Part II.E of their brief, Defendants argue that "[t]he permanent injunction [as entered] contains serious legal flaws requiring that it be altered, amended or vacated" under Rule 60(b)(6).  (*See* Doc. 250 at 12; Doc. Doc. 276 at 7.)  As aforementioned, to satisfy Rule 60(b)(6), the moving party "must 'demonstrate that the circumstances are sufficiently extraordinary to warrant relief.'"  *Ramsey*, 304 F. App'x at 828 (quoting *Toole*, 235 F.3d at 1317).

Defendants first object to pages 3 through 7 of the Final Judgment and Permanent Injunction.  (Doc. 250 at 12-14.)  Specifically, Defendants argue that the pages contain "superfluous and irrelevant commentary" regarding the jury's verdict, and, "[f]or example . . . [i]nexplicably . . . contend[] that because the jury award was $1,000,000 in the aggregate,

---

[13] For example, the "potential impact on judicial proceedings" from the court's refusal to consider Defendants' arguments in Part V of their Post-Verdict Brief, where Defendants insist that the court should not grant attorneys' fees to GSCO, is minimal. (*See* Doc. 240 at 24.)  Defendants repeat the same arguments in their Brief in Opposition to Plaintiff's Motion for Attorneys' Fees. (Doc. 264.)  Therefore, Defendants' cited case, *Cheney v. Anchor Glass Container Corp.*, 71 F.3d 848 (11th Cir. 1996), is inapposite.  (*See* Doc. 250 at 6.)  In that case, plaintiff's counsel failed to file a request for trial *de novo* within 30 days of the date an arbitration panel entered an otherwise nonbinding arbitration award, as required by the district court's local rule.  *Cheney*, 71 F.3d at 849. Because the district court refused to excuse the late filing, the impact on the judicial proceedings was severe in that the nonbinding arbitration award resulted in judgment against the plaintiff.  *See id.* at 849.  But, the Eleventh Circuit stated that because both sides had proceeded with discovery and trial preparation under the presumption that the arbitration award would indeed be nonbinding, the potential impact on judicial proceedings by excusing the late filing was minimal.  *Id.* at 849-90.

then such damage is attributable to damage to 'reputation . . . in the community, and/or the goodwill in its marks.'" (*Id.* at 12.) However, as GSCO notes, Defendants have "provide[d] no case law support for its arguments" with respect to pages 3 through 7 of the Final Judgment and Permanent Injunction. (Doc. 275 at 6.) The Permanent Injunction actually states that the "award of $1,000,000 compensatory damages [indicates] the jury clearly found that Defendants' use of the GSC/O Marks had damaged GSC/O, its reputation in the community, and/or the goodwill in the GSC/O Marks." (Doc. 242 at 6, ¶ 6.) Thus, the Permanent Injunction recognizes, at least implicitly, that the jury could have awarded $1,000,000 in compensatory damages without awarding any damages related to GSCO's reputation and goodwill. (*See id.*)

Next, Defendants object to paragraph 1.a of the Permanent Injunction as "unduly broad" because "it attempts to enjoin defendants from using 'any phrase or combination of words using the word 'Slam,''" even though "GSCO does not have a monopoly on the word 'Slam.'" (Doc. 250 at 13 (quoting Doc. 242 at 7-8, ¶ 1.a.) In response, GSCO points out that "Defendants' argument . . . is misleading" because "[t]he permanent injunction is specifically limited to using phrases or words having 'SLAM' in connection with the specified wild sheep and goat hunting or conservation goods and services." (Doc. 275 at 6.) The court agrees with GSCO, and finds that paragraph 1.a is not "unduly broad" given its limiting clause and when "*reasonably construed.*" *Chandler v. James*, 998 F. Supp. 1255, 1269

17

(M.D. Ala. 1997) (quoting *Ala. Nursing Home Ass'n v. Harris*, 617 F.2d 385, 388 (5th Cir. 1980)).[14]

Defendants also object to paragraph 1.c, arguing "[t]his paragraph is vague and ambiguous and does not adequately instruct defendants regarding the specific conduct to be enjoined." (Doc. 250 at 13.)  The paragraph, in context, states:

> Defendants . . . shall be immediately **PERMANENTLY ENJOINED** and **RESTRAINED** from . . . otherwise engaging in any other acts or conduct which would cause consumers to erroneously believe that the goods or services offered by ISHA and/or FNAWS in the field of wild sheep or goat hunting are somehow sponsored by, cosponsored by, authorized by, licensed by, or in any other way associated with GSC/O.

(Doc. 242 at 7-8, ¶ 1.c.)  In their reply brief, Defendants cite to the Fifth Circuit opinion of *Alabama Nursing Home Ass'n v. Harris*, 617 F.2d at 387 (holding that "[e]very order granting an injunction must be specific in its terms and must describe in reasonable detail the act or acts that are enjoined").  (Doc. 276 at 9.)  In response, GSCO argues that paragraph 1.c is "in line with the practice of the Eleventh Circuit," and insists that other district courts in the circuit "have entered injunctions having even broader language."  (Doc. 275 at 7.)  In support, GSCO cites to *Pepper's Fine Foods, Inc. v. Pepper's Butcher Shop & Deli, Inc.*, (*see* Doc. 275 at 7), where the district court enjoined the defendants from, *inter alia*, "otherwise unfairly competing in any way with Plaintiff," *Pepper's Fine Foods, Inc.*, No. 2:02CV154FTM29DMF, 2002 WL 32060143, at *2 (M.D. Fla. 2002).  In short, the court

---

[14] Decisions of the United States Court of Appeals for the Fifth Circuit issued prior to the close of business on September 30, 1981, are binding as precedent in the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

agrees with GSCO, and finds that the language of paragraph 1.c does not amount to "circumstances [that] are sufficiently extraordinary to warrant relief." *See Ramsey*, 304 F. App'x at 828 (quoting *Toole*, 235 F.3d at 1317).

As to paragraph 1.e, Defendants claim "[t]his paragraph impermissibly orders defendants to forego legal remedies that might otherwise be available to them at law." (Doc. 250 at 13.)  The paragraph prevents Defendants from "filing any petition or other action to oppose GSC/O applications to register any of the GSC/O Marks or filing any petition or other actions to cancel any GSC/O registrations of the GSC/O Marks, or prosecuting any such pending actions." (Doc. 242 at 9, ¶ 1.e.)  GSCO, however, asserts that paragraph 1.e "refers to collateral proceedings, not the present action," and, at any rate, the paragraph "simply reflects the *res judicata* effect of Grand Slam's marks being found valid by the jury." (Doc. 275 at 9.)  Again, the court agrees.  Unless and until the jury's findings are overturned, which the court has instead expressly relied upon in entering Findings and Conclusions, issue preclusion bars Defendants from relitigating the validity of GSCO's marks.  *See Allen v. McCurry*, 449 U.S. 90, 94 (1980) (stating that "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation on the issue" (citing *Montana v. United States*, 440 U.S. 147, 153 (1979))).

Defendants next object to paragraph 2.a, which requires that Defendants "post a copy of this permanent injunction on their respective sites"; Defendants allege that the paragraph "seemingly require[s] defendants to maintain a website into perpetuity." (Doc. 250 at 14;

Doc. 242 at 9, ¶ 2.a.)  But, as GSCO maintains, "[i]f Defendants no longer maintain a website, then obviously they do not have a website on which the permanent injunction should be posted."  (Doc. 275 at 9.)  "[R]easonably constru[ing]" paragraph 2.a, the court is of the opinion that the language is appropriate as entered.  *See Harris*, 617 F.2d at 387 (citing *Sierra Club v. Callaway*, 499 F.2d 982, 991 (5th Cir. 1974)).

Finally, regarding paragraphs 2.c and 3, which in part require that Defendants "dismiss[ with prejudice] . . . the opposition and cancellation actions pending before the Trademark Trial and Appeal Board" "within thirty (30) days of the entry of this permanent injunction," Defendants argue that they "do not have the power to dismiss the actions . . . [r]ather, [their] power is limited to withdrawing their oppositions and seeking dismissal." (Doc. 242 at 10, ¶ 2.c, ¶ 3; Doc. 250 at 14.)  GSCO responds by admitting that "[r]ead in an overly narrow and unduly literal fashion, perhaps Defendants are correct."  (Doc. 275 at 9.) But, GSCO notes that "when read with common sense, the paragraphs require Defendants to file papers with the [Trademark Trial and Appeal Board] to cause such a dismissal with prejudice to occur."  (*Id.*)  Because the injunction must be "*reasonably construed*," the court agrees with GSCO.  *See Chandler*, 998 F. Supp. at 1269 (quoting *Harris*, 617 F.2d at 388). Thus, the court finds Defendants' arguments regarding paragraphs 2.c and 3 of the Final Judgment and Permanent Injunction to be unavailing, and do not constitute "circumstances [that] are sufficiently extraordinary to warrant relief" under Rule 60(b)(6).  *See Ramsey*, 304 F. App'x at 828 (quoting *Toole*, 235 F.3d at 1317).  Therefore, having rejected all of

Defendants' arguments, the court finds that Defendants' motion pursuant to Fed. R. Civ. P. 60(b) is due to be denied.

## B.    DEFENDANTS' MOTION PURSUANT TO FED. R. CIV. P. 62(b) (DOC. 249)

Pursuant to Fed R. Civ. P. 62(b), Defendants moved the court "for an order staying execution of the Judgment entered on February 15, 2008, and suspending enforcement of the injunctive relief granted on that date, pending the Court's resolution of [Defendants' other] motions." (Doc. 249 at 4.)  Defendants also filed a brief with their motion.  (Doc. 251.)  In response, in their Opposition to Defendant's Post-Judgment Motion Pursuant to Rule 62(b), GSCO does not object to a stay of the monetary judgment "if a proper bond security is required by the Court."  (Doc. 267 at 1.)  Nevertheless, GSCO does object to a stay of the permanent injunction.  (*Id.* at 2.)  Defendants filed a reply brief.  (Doc. 277.)  Because this Memorandum Opinion and the contemporaneously filed Findings and Conclusions decide all of the parties' pending motions, Defendants' Post-Judgment Motion Pursuant to Rule 62 is due to be denied as moot.

## C.    DEFENDANTS' POST-JUDGMENT MOTION PURSUANT TO FED. R. CIV. P. 50(b) (DOC. 259)

Pursuant to Fed. R. Civ. P. 50(b), Defendants filed a motion "for entry of judgment as a matter of law in their favor against [GSCO]."  (Doc. 259 at 1.)  Defendants filed a

supporting brief with their motion.  (Doc. 260.)  GSCO filed its Opposition to Defendants'

Post-Judgment Motion Pursuant to Rule 50(b), (Doc. 272), and a reply brief.  (Doc. 278).


1.      STANDARD OF REVIEW UNDER RULE 50(b)

Fed. R. Civ. P. 50(b) states the procedure regarding a party's "renewed motion for

judgment as a matter of law" following a jury verdict in the party's case.  Because a Rule

50(b) motion is a "renewed" motion, the party filing it must have previously moved the court

for judgment as a matter of law under Rule 50(a).  *Shannon v. BellSouth Telecomm., Inc.*,

292 F.3d 712, 717 n.3 (11th Cir. 2002).  Thus, to the extent "a party asserts new grounds in

its renewed motion for judgment as a matter of law that it did not assert in its initial motion

for judgment as a matter of law, a court 'may not rely on the new grounds to set aside the

jury's verdict.'"  *Id.* (quoting *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1289 (11th Cir.

1998).  Rule 50(b) states:

> If the court does not grant a motion for judgment as a matter of law made under Rule
> 50(a), the court is considered to have submitted the action to the jury subject to the
> court's later deciding the legal questions raised by the motion.  No later than 10 days
> after the entry of judgment–or if the motion addresses a jury issue not decided by a
> verdict, no later than 10 days after the jury was discharged–the movant may file a
> renewed motion for judgment as a matter of law and may include an alternative or
> joint request for a new trial under Rule 59.  In ruling on the renewed motion, the
> court may:
>     **(1)**    allow judgment on the verdict, if the jury returned a verdict;
>     **(2)**    order a new trial; or
>     **(3)**    direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b).

The Eleventh Circuit has further directed that "in ruling on a party's renewed motion under Rule 50(b) after the jury has rendered a verdict, a court's sole consideration of the jury verdict is to assess whether that verdict is supported by sufficient evidence." *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007) (citing *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001)).  In making that determination, the court "should review all of the evidence in the record and must draw all reasonable inferences in favor of the nonmoving party." *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192-93 (11th Cir. 2004) (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148-51 (2000)).  But, it is important to note that "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* at 1193 (quoting *Reeves*, 530 U.S. at 150).  Therefore, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* (quoting *Reeves*, 530 U.S. at 151).  And, "[i]f reasonable jurors could reach different results, [the court] must 'not second-guess the jury or substitute [its own] judgment for [the jury's] judgment." *Shannon*, 292 F.3d at 715 (quoting *Lipphardt*, 267 F.3d at 1186).  In sum, "[t]he jury's verdict must stand unless 'there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Id.* (quoting Fed. R. Civ. P. 50(a)(1)).

2.   DEFENDANTS' ARGUMENTS UNDER 50(b)

In support of their renewed motion for judgment as a matter of law, Defendants contend that "there was no legally sufficient evidentiary basis [for a reasonable jury] to find for GSCO" regarding "(a) its claims for trademark infringement," "(b) its copyright claims," "(c) its claims for breach of contract and tortious interference," and "(d) its claims for intentional interference with business or contractual relations."   (Doc. 259 at 1-2.) Defendants further claim that "no sufficient evidentiary basis was adduced at trial to support an award of money damages on GSCO's [trademark] infringement claims."   (*Id.* at 2.)

a.   *GSCO's Trademark Infringement Claims*

Defendants maintain they are entitled to judgment as a matter of law "because there was no legally sufficient evidentiary basis to find for GSCO on . . . its claims for trademark infringement because" (1) "GSCO abandoned its marks through naked licensing," (2) "GSCO's marks are generic or descriptive and lack secondary meaning," (3) "GSCO was not the first user of the marks," and (4) "there was no likelihood of confusion."   (*Id.*)   Also, Defendants argue "no sufficient evidentiary basis was adduced at trial to support an award of money damages on GSCO's [trademark] infringement claims."   (*Id.*)

"A trademark is 'any word, name, symbol, or device, or any combination thereof [used] to identify and distinguish [one's] goods . . . from those manufactured or sold by others and to indicate the source of the goods.'"   *Int'l Stamp Art, Inc. v. U.S. Postal Serv.,*

24

456 F.3d 1270, 1274 (11th Cir. 2006) (quoting *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 797 (11th Cir. 2003)).  Similarly, "[t]he Lanham Act defines a service mark to be 'a mark used in the sale or advertising of service to identify the services of one person and distinguish them from the services of others.'"  *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 11 (5th Cir. 1974) (citing 15 U.S.C. § 1127).  Generally, "[t]o establish a *prima facie* case in an ordinary trademark infringement suit, a claimant need only demonstrate that: (1) it enjoys enforceable rights in its mark, and (2) the alleged infringer adopted a mark that is the same or confusingly similar."  *SunAmerica Corp. v. Sun Life Assurance Co. of Canada*, 77 F.3d 1325, 1334 (11th Cir. 1996) (citing *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512 (11th Cir. 1984)).  The test for infringement of a service mark is substantially the same.  *See Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1357 (11th Cir. 2007) (citing *Int'l Stamp Art, Inc.*, 456 F.3d at 1274).


(1).   Defendants' argument that GSCO abandoned its marks through naked licensing

First, Defendants argue the evidence at trial established that "GSCO abandoned its marks through naked licensing" by granting a naked license to Safari Club International ("SCI") in the early 1980s, and, for that reason, "no reasonable jury could find a legally sufficient evidentiary basis to find trademark infringement in the face of such undisputed evidence of a naked license."  (Doc. 260 at 1, 4-6.)  Indeed, "the law imposes a duty upon a licensor . . . to supervise a licensee's use *of the licensor's own trademark*."  *Mini Maid*

*Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1519 (11th Cir. 1992) (citing *Ron Matusalem & Matusa, Inc. v. Ron Matusalem, Inc.*, 872 F.2d 1547, 1551 (11th Cir. 1989)). "Such a duty of supervision derives from the Lanham Act's abandonment provisions, which specify that a registrant's mark may be canceled if the registrant fails to control its licensees' use of the licensed mark," by, for example, granting a "naked" license.[15]  *Id.* (citing 15 U.S.C. § 1064(5)(A) (1988)).  But, "absent an ultimate showing of loss of trade significance [naked licensing] is not available as a defense against an infringement suit brought by that trademark owner." *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1080 (5th Cir. 1997) (citing 3 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 17:17 (4th ed. 1996)).

Here, GSCO argues that Judge Hopkins specifically instructed the jury on Defendants' arguments regarding abandonment and naked licensing, but that the jury rejected the arguments by finding GSCO's marks to be valid.  (Doc. 272 at 4; Doc. 234 at 33; Doc. 235 at Question I.1.)  GSCO further notes that substantial evidence supports that rejection.  (Doc. 272 at 4-5.)  For example, GSCO points to the testimony of Warren Parker, a lifetime member of SCI's Board of Directors.  (*Id.* at 5.)  Mr. Parker testified that he and Bob

---

[15] "A naked license is a trademark licensor's grant of permission to use its mark without attendant provisions to protect the quality of the goods or services provided under the licensed mark." *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1075 (5th Cir. 1997) (citing *Taco Cabana Intern., Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1121 (5th Cir. 1991), *aff'd*, 505 U.S. 763 (1992)).  *See also Barcamerica Intern. USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 598 (9th Cir. 2002) (noting that "the proponent of a naked license theory 'faces a stringent standard' of proof" (quoting *Moore Bus. Forms, Inc. v. Ryu*, 960 F.2d 486, 489 (5th Cir. 1992))).

Housholder, founder of "The Grand Slam Club," GSCO's claimed predecessor, "had quite a lengthy conversation about [SCI's use of the "Grand Slam" mark]" before Mr. Housholder consented to SCI's use.  (*See id.*; Doc. 271, Ex. A at 6:1-9, 21:3-13.)  Mr. Parker further testified that he remained in contact with Mr. Housholder "on a regular basis," and later had "quite a bit [of] conversations with [Dennis Campbell]," GSCO's current president, regarding SCI's use of GSCO's marks.[16]  (Doc. 271 at 22:20-23:21.)  GSCO next points out that D. Taylor DeBoer, the Marketing Director for GSCO, testified that he had not learned of any confusion due to SCI's use of the "Grand Slam" mark, and that GSCO had not lost

---

[16] Defendants, however, stress that Mr. Parker's testimony demonstrates that GSCO abandoned its trademarks through naked licensing.  (Doc. 260 at 5; Doc. 278 at 4-5.)  Specifically, Defendants note:

> Moreover, Parker testified that SCI's failure to use the same quality controls employed by GSCO in awarding recognition to hunters for taking the GRAND SLAM and GRAND SLAM OF NORTH AMERICAN WILD SHEEP [i.e. by requesting documentation] "harms the hunting industry as a whole not to have documentation of all of the species to make sure they were all legally taken."

(Doc. 278 at 4-5 (quoting Doc. 278, Ex. C at 48:17-19).)  Defendants argue "[t]his is exactly the type of harm to the public that the policy underlying the naked licensing defense was intended to address," and cite to *Exxon Corp.*, 109 F.3d at 1079 ("'[I]f a trademark owner allows licensees to depart from his quality standards, the public will be misled, and the trademark will cease to have utility as an informational device . . . [a] trademark owner who allows this to occur loses his right to use the mark.'" (quoting *Ky. Fried Chicken Corp. v. Diversified Packing Corp.*, 549 F.2d 368, 387 (5th Cir. 1977))).  (*See* Doc. 278 at 5.)  But, a closer review of Mr. Parker's testimony reveals that, in his opinion, the public was not misled by SCI's use of the mark; he stated that SCI's failure to request documentation when granting an SCI Grand Slam award did not "lessen[] the value" of GSCO's Grand Slam awards because "most of the hunting community knew that [SCI had permission from GSCO to use the term Grand Slam]."  (*Id.*, Ex. C at 47-50.)  Thus, even if parts of Mr. Parker's testimony support Defendants' naked licensing argument, other parts, if believed, weigh against it.  But, as aforementioned, "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Cleveland*, 369 F.3d at 1193 (quoting *Reeves*, 530 U.S. at 150).

revenue because of SCI's use.  (Doc. 272 at 5; Doc. 271, Ex. F at 4:2-6, 102:17-103:3.)

Finally, GSCO highlights its "fifty years of use of the Grand Slam marks, federal

registrations, millions of dollars in promotion and sales, and evidence of actual confusion

from Defendants' use," as additional evidentiary support.  (*See* Doc. 272 at 6 (internal

footnote omitted).)  As a result, GSCO argues that "[t]he evidence at trial amply supports the

jury's rejection of the naked licensing claim."  (*Id.* at 5.)  The court agrees.[17]  Drawing all

reasonable inferences in GSCO's favor, the court is of the opinion that the jury verdict, as

it relates to Defendants' abandonment argument through naked licensing, is supported by

sufficient evidence.

(2).    <u>Defendants' argument that GSCO's marks are generic or descriptive and lack</u>
        <u>secondary meaning</u>

As their second basis for judgment as a matter of law, Defendants contend that "[t]he

evidence at trial overwhelmingly demonstrated that GSCO's claimed marks GRAND SLAM

and GRAND SLAM OF NORTH AMERICAN WILD SHEEP were generic terms or, at best,

merely descriptive terms [that lacked secondary meaning]."  (Doc. 260 at 6.)  Consequently,

---

[17] For example, the jury could have concluded that because GSCO maintained contact with SCI through Bob Housholder and Dennis Campbell's relationships with Warren Parker, and because Taylor DeBoer testified that, to his knowledge, no actual confusion or decreased revenue resulted from SCI's use of the "Grand Slam" mark, that GSCO did not abandon its marks or otherwise "fail[]" to exercise adequate quality control."  (*See* Doc. 271, Ex. A at 21-23, Ex. F at 102-03; Doc. 234 at 33.)  Or, instead, the jury could have simply decided that Defendants failed to "persuade [them] that [Defendants' abandonment argument] is more likely true than not true," in that the jury instructions properly stated that "[t]he defendants ha[d] the burden of proving abandonment."  (*See* Doc. 234 at 7, 33.)

Defendants argue that "no reasonable jury could find the claimed marks to be protectable," thereby addressing the first element in a trademark infringement suit, which requires enforceable rights in a mark.  (*Id.*)

For a mark to be protectable, it must be "distinctive," meaning the mark must "serve the purpose of identifying the source of the goods or services."  *Welding Servs., Inc.*, 509 F.3d at 1357 (quoting *Two Pesos, Inc.*, 505 U.S. at 768-69).  Registering a mark with the United States Patent and Trademark Office ("USPTO") "establishes a rebuttable presumption that the mark[ is] protectable or 'distinctive.'"  *Id.* at n.3 (citing 15 U.S.C. § 1057(b)).

Trademark law identifies four categories of marks based on a mark's level of distinctiveness: (1) "fanciful or arbitrary," reserved for the most distinctive marks, (2) "suggestive," (3) "descriptive," and (4) "generic," representing the least distinctive marks.[18] *Id.* at 1357-58 (citing *Soweco, Inc.*, 617 F.2d at 1183).  The first two categories of marks, fanciful or arbitrary marks and suggestive marks, are "inherently distinctive" and capable of

---

[18] The Eleventh Circuit has further defined the categories:

An arbitrary or fanciful mark bears no logical relationship to the product or service it is used to represent.  A suggestive mark refers to some characteristic of the goods, but requires a leap of the imagination to get from the mark to the product.  A descriptive mark identifies a characteristic or quality of the service or product.

*Welding Servs., Inc.*, 509 F.3d at 1357-58 (citations omitted).  As to the fourth category, generic marks, the court stated that, at least by one definition, "a generic name refers to 'a particular genus or class of which an individual article or service is but a member.'"  *Id.* (noting that "'ivory' is generic of elephant tusks but arbitrary as applied to soap" (quoting *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 (5th Cir. 1980))).  That said, the Eleventh Circuit has recognized that "'[t]he demarcation between each category is more blurred than it is definite.'"  *St. Luke's Cataract & Laser Inst. v. Sanderson*, 573 F.3d 1186, 1209 (11th Cir. 2009) (quoting *Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1559 (11th Cir. 1991)).

protection, while the fourth category, generic marks, are not protectable.  *See Two Pesos,*

*Inc.*, 505 U.S. at 768 (citing *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194

(1985)).  The third category of marks, descriptive marks, are not inherently distinctive, but

may become distinctive, and therefore protectable, by acquiring "secondary meaning."  *See*

*id.* at 769 (citing *Park 'N Fly, Inc.*, 469 U.S. at 194, 196).

A term acquires secondary meaning when "'the primary significance of the term in

the minds of the [consuming] public is not the product but the producer.'"  *Welding Servs.,*

*Inc.*, 509 F.3d at 1358 (quoting *Am. Television & Commc'ns Corp. v. Am. Commc'ns &*

*Television, Inc.*, 810 F.2d 1546, 1548-89 (11th Cir. 1987)).  The Eleventh Circuit has

identified the four factors relevant in this inquiry:

> The determination of whether a mark has acquired secondary meaning depends on
> "the length and nature of the [the mark's] use, the nature and extent of advertising
> and promotion of the [mark], the efforts of the proprietor to promote the conscious
> connection between the [mark] and the business, and the degree of actual recognition
> by the public that the [mark] designates the proprietor's product or service."

*St. Luke's Cataract & Laser Inst. v. Sanderson*, 573 F.3d 1186, 1209 (11th Cir. 2009)

(quoting *Welding Servs., Inc.*, 509 F.3d at 1358).  Also, "instances of [actual] consumer

confusion are probative of secondary meaning," in that they demonstrate the public's

recognition that the mark designates the proprietor's product or service.  *See Investacorp,*

*Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d 1519, 1526 (11th Cir. 1991); *see also Adray v.*

*Adry-Mart Inc.*, 76 F.3d 984, 987 (9th Cir. 1995) (noting that "the law clearly establishes that

'actual confusion is an indicium of secondary meaning'" (quoting *Am. Scientific Chem. v. Am. Hosp. Supply*, 690 F.2d 791, 793 (9th Cir. 1982))).

In the instant case, GSCO contends that "the jury heard all of Defendants' evidence and decided that the Grand Slam marks are valid and infringed," and that "[s]ubstantial evidence" backs that decision.[19]   (Doc. 272 at 7.)   Initially, GSCO points to its "federal registrations, fifty years of use, and millions of dollars in promotion and sales."   (*Id.*)   Also, GSCO argues that "the testimony and evidence at trial showing numerous instances of actual confusion from Defendants' use are direct evidence of the secondary meaning and protectable status of the Grand Slam marks."[20]   (*Id.*)   After reviewing the trial record, the court agrees.[21]   For example, Dennis Campbell testified that GSCO sought and attained federal registration certificates for its marks "Grand Slam," "Grand Slam of North American

---

[19] GSCO also alleges that Defendants "waived any argument under Rule 50 regarding the jury's infringement finding because they did not make any Rule 50(a) motion on the grounds of non-infringement prior to the verdict."  (Doc. 272 at 7.)  However, a review of the record reveals that counsel for Defendants did move under Rule 50(a) regarding GSCO's trademark infringement claims, and specifically addressed the issue of "whether the mark is protectable," arguing in part "that no reasonable jury could find that these marks are distinctive or arbitrary based on the evidence that shows that at least they're at least [merely] descriptive if not generic."  (Doc. 319 at 142:2-20, 148:1-7.)  Thus, GSCO's allegation is without merit.

[20] Specifically, GSCO cites to plaintiff's trial exhibits 208, 219, 220, 222, 223, and 2348, referencing emails to and from GSCO members.  (*See* Doc. 272 at 7 n.4; Doc. 314 at 29-30.)

[21] It is also relevant that when FNAWS initially opposed GSCO's trademark and service mark registration applications as to, *inter alia*, the GRAND SLAM and GRAND SLAM OF NORTH AMERICA WILD SHEEP marks, FNAWS did not argue that the marks were generic or merely descriptive that lacked secondary meaning, and thus invalid and not protectable.  (*See* Pl.'s Trial Exs. 162 & 165; Doc. 257 at 7; Doc. 270 at 2.)  Instead, FNAWS affirmed the marks' validity by asserting that it, and not GSCO, had acquired common law rights to the marks.  (*See* Pl.'s Trial Exs. 162 & 165; Doc. 257 at 7; Doc. 270 at 2.)

Wild Sheep," "Ovis World Slam," and "Capra World Slam." (Doc. 311 at 163:7-23, 164:14-22, 166:7-15, 167:12-19, 168:12-16, 169:21-25.) Judge Hopkins admitted those certificates into evidence. (*See* Pl.'s Trial Exs. 1, 2, 3, 4 & 5.) Mr. Campbell testified further that GSCO "continues the same procedures that [its predecessor] the Grand Slam Club has always handled [since its foundation in 1956]," and has used the marks "Grand Slam" and "Grand Slam of North American Wild Sheep" since 1967, when the Grand Slam Club first published its newsletter, "the Grand Slam Club Bulletin." (*See* Doc. 311 at 140:9-13, 142:23-143:19, 166-68.)  What's more, he affirmed that GSCO has "maintained [all of its registered marks] since the date they were issued by the government." (*Id.* at 170:18-20.)  Additionally, D. Taylor DeBoer discussed GSCO's marketing campaigns and advertising budget, stated that GSCO's advertisements include its trademarks, and noted that GSCO set aside approximately $370,000 for marketing expenses in 2006. (Doc. 317 at 21-23.)  Finally, both Mr. Campbell and Mr. DeBoer offered specific instances of actual confusion arising from Defendants' use of GSCO's marks. (*E.g.*, Doc. 315 at 91-99; Doc. 317 at 24-27.)  For instance, Mr. DeBoer testified about a conversation he had with a GSCO member, Tom Paluso, who had mistakenly "thought when [he] registered [his] Grand Slam of FNAWS that it automatically registered [his] slam with [GSCO]." (Doc. 317 at 24-27.) Judge Hopkins admitted the email Mr. DeBoer sent to Mr. Paluso in response to that misunderstanding. (Pl.'s Trial Ex. 219.) Drawing all reasonable inferences in favor of GSCO, the court finds that GSCO provided sufficient evidence of the factors relevant in determining whether a mark has acquired

secondary meaning to support the jury's verdict that GSCO had valid, protectable marks.[22]
*See St. Luke's Cataract & Laser Inst.*, 573 F.3d at 1209 (quoting *Welding Servs., Inc.*, 509 F.3d at 1358).

(3).   <u>Defendants' argument that GSCO was not the first user of its marks</u>

For Defendants' third basis for judgment as a matter of law, they contend "[t]he evidence at trial demonstrated that GSCO was not the first user of any of its registered marks for their particular purposes," and offer several arguments in support.  (Doc. 260 at 11.) GSCO asserts that "all of these arguments are waived under Rule 50 because Defendants did not make their 'first use' and assignment arguments in a pre-verdict motion for judgment as a matter of law."  (Doc. 272 at 8-9.)  Defendants, however, claim they "specifically moved under Rule 50(a) '[a]s to plaintiff's trademark infringement, all of plaintiff's trademark claims, infringement, dilution, unfair competition, and as to [D]efendant[s'] cancellation claim."  (Doc. 278 at 1 (quoting Doc. 278, Ex. A at 47:4-9).)  After reviewing the record, the court finds that Defendants indeed moved under Rule 50(a) as to those claims and raised several grounds, but did not move under Rule 50(a) as to their third ground for judgment as a matter of law, i.e. that GSCO "was not the first user of any of its registered marks."  (*See* Doc. 319 at 141:2-5; Doc. 260 at 11.)  Therefore, the court finds that Defendants have

---

[22] Alternatively, because Defendants had the burden of demonstrating that GSCO's federally registered marks were not distinctive, the jury could have merely decided that Defendants failed to show that GSCO's marks were generic or descriptive and lack secondary meaning.  *See Welding Servs., Inc.*, 509 F.3d at 1357 n.3 (citing 15 U.S.C. § 1057(b)).

waived that new ground.[23]  *See Shannon*, 292 F.3d at 717 n.3 (noting that to the extent "a party asserts new grounds in its renewed motion for judgment as a matter of law that it did not assert in its initial motion for judgment as a matter of law, a court 'may not rely on the new grounds to set aside the jury's verdict'" (quoting *Ross*, 146 F.3d at 1289)); *see also* Fed. R. Civ. P. 50(b) advisory committees' note (1991 Amendment) (stating that "[a] post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion").

(4).   <u>Defendants' argument that there was no likelihood of confusion</u>

Regarding their fourth argument for judgment as a matter of law, Defendants claim that "[e]ven if GSCO's registered marks were protectable and GSCO had been the first user in commerce for the particular purposes stated, there was no legally sufficient basis for the jury to find likelihood of confusion." (Doc. 260 at 13.)  As with their "first user" argument, however, Defendants have likewise waived this argument; Defendants failed to raise the issue in their pre-verdict motion for judgment as a matter of law.[24]  *See Shannon*, 292 F.3d at 717 n.3.

---

[23] Defendants' third ground is also without merit, as noted in the court's discussion of Defendants' Rule 59 motion.  *See infra* Part II.D.2.a.(1).(b).

[24] And, even assuming Defendants had preserved the argument, it nonetheless fails on the merits.  *See infra* Part II.D.2.a.(1).(c).

(5).   <u>Defendants' argument that no evidence supports the jury's award of damages</u>

Finally, as to Defendants' final ground for judgment as a matter of law on GSCO's trademark infringement claims, Defendants contend that "there was no legally sufficient evidentiary basis to find that GSCO sustained money damages, and no reasonable basis upon which to determine any specific dollar amount of damage."  (Doc. 260 at 14-15.)  Again, Defendants failed to raise the argument under Rule 50(a), (*see* Doc. 319 at 141-51), and for that reason have waived it.[25]  *See Shannon*, 292 F.3d at 717 n.3.  Therefore, because the court finds all of Defendants' grounds to be either waived or without merit, the court is of the opinion that Defendants' Post-Judgment Motion Pursuant to Fed. R. Civ. P. 50(b) is due to be denied as to GSCO's trademark infringement claims.

b.   *GSCO's Copyright Infringement Claims*

Defendants also maintain they are entitled to judgment as a matter of law under Rule 50(b) "because there was no legally sufficient evidentiary basis to find for GSCO on . . . its copyright claims."  (Doc. 259 at 2.)  Specifically, Defendants argue that GSCO's CAPRA SLAM and OVIS WORLD SLAM copyrighted documents contain "non-copyrightable elements," and that "[o]nce such unprotectable elements are removed, all that is left are the coordination and arrangement of goats and sheep [which] are not the result of originality or creativity."  (Doc. 260 at 22-23.)  Also, Defendants claim that "GSCO cannot maintain a

---

[25] The argument is also without merit.  *See infra* Part II.D.2.a.(1).(d).

claim of copyright infringement against Defendants based on its OVIS World Slam Form, because the evidence at trial was undisputed that ISHA developed the Super Slam concept . . . upon which GSCO apparently bases its World Slam concepts." (*Id.* at 24.) In response, GSCO reiterates that "[y]et again, Defendants are raising waived issues, as Defendants did not argue against the validity of [GSCO's] registered copyrights or infringement of those registered copyrights during their Rule 50(a) motion." (Doc. 272 at 28-29.) GSCO is correct. After reviewing the record, the court finds that the only issue raised by Defendants in their Rule 50(a) motion regarding GSCO's copyright claims was that GSCO failed to submit the correct CAPRA WORLD SLAM and OVIS WORLD SLAM documents into evidence. (*See* Doc. 317 at 139-150, 160-162.) But, Judge Hopkins rejected that argument under Rule 50(a), and Defendants did not renew it under Rule 50(b). (*See id.* at 180-82; Doc. 260 at 22-25.) As a result, all of the grounds now asserted by Defendants under Rule 50(b) with regard to GSCO's copyright claims involve "new grounds," not asserted under Rule 50(a); those grounds are waived.[26]  *See Shannon*, 292 F.3d at 717 n.3. For that reason, the court is of the opinion that Defendants' Post-Judgment Motion Pursuant to Fed. R. Civ. P. 50(b) is due to be denied as to GSCO's copyright infringement claims.

---

[26] The arguments fail on the merits as well. *See infra* Part II.D.2.a.(2).

36

c.      *GSCO's Breach of Contract and Tortious Interference Claims*

Next, addressing GSCO's breach of contract and tortious interference claims, Defendants assert that no legally sufficient evidentiary basis exists to support the jury's verdict "due to GSCO's failure to prove the essential element of damages," and therefore Defendants are entitled to judgment as a matter of law.[27]  (Doc. 259 at 2.)

Under Alabama law, to state a claim for tortious or "wrongful" interference with a business relationship, the plaintiff must satisfy five elements: "(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *White Sands Group, L.L.C., v. PRS II, LLC*, 32 So.3d 5, 14 (Ala. 2009).  Damages for the claim may include: "'(1) the pecuniary loss of the benefits of the . . . relation; (2) consequential losses for which the interference is a legal cause; . . . (3) emotional distress or actual harm to reputation if either is reasonably to be expected to result from the interference,' and (4) punitive damages." *Id.* at 17 (quoting *KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1265, 1268 (M.D. Ala. 2001) (internal citation omitted).  That said, "damages may not be awarded where they are remote or speculative.  A jury must have some reasonable basis for the amount of its award." *Parsons v. Aaron*, 849 So.2d 932, 949 (Ala. 2002); *Torsch v. McLeod*, 665 So.2d 934, 940 (Ala. 1995) (citing *Cook v. Brown*, 428 So.2d

_____

[27] As GSCO notes, it "has conceded that it is not entitled to, and it was not awarded, the damages found by the jury for its contract claim because they are duplicative of its damages for the trademark infringement claim."  (Doc. 272 at 21; Doc. 239 at 1-2.)  Therefore, the court finds Defendants' arguments as to the jury's award on GSCO's breach of contract claim to be moot.

59 (Ala. Civ. App. 1982)).   However, damages "need not be proved to a mathematical certainty," *Systrends, Inc. v. Group 8760, LLC*, 959 So.2d 1052, 1075 (Ala. 2006), and a "wrongdoer should not escape liability on the grounds that its misconduct has made it difficult for the innocent plaintiff to precisely determine its loss," *KW Plastics*, 131 F. Supp. 2d at 1268 (citing *Super Valu Stores, Inc. v. Peterson*, 506 So.2d 317, 328 (Ala. 1987)).

In the instant case, after receiving detailed instructions, the jury awarded GSCO $400,000 for its tortious interference with business relations claims, to be paid equally by Defendants.   (Doc. 234 at 34, 46-50; Doc. 235 at Question IV.2.)   Defendants insist that "GSCO's allegations of damages were speculative at best, and there was no legally sufficient basis upon which to find that any damage was caused by Defendants."   (Doc. 260 at 19.)   In support, Defendants incorporate their arguments regarding GSCO's trademark claims, inferring they demonstrate the lack of a sufficient evidentiary basis as to damages on GSCO's tortious interference claims as well.[28]   (*See id.*)

Initially, Defendants oppose the testimony of Taylor DeBoer, GSCO's primary witness on the issue of damages, insisting that his testimony does not constitute legally

---

[28] GSCO objects to Defendants' incorporation of these arguments, insisting that Defendants waived them by failing to raise the issue of damages in their Rule 50(a) motion regarding GSCO's trademark claims.  (Doc. 272 at 21.)  GSCO is correct that Defendants waived the issue of damages under Rule 50(b) with regards to GSCO's trademark claims, *see supra* Part II.C.2.a.(5); however, Defendants did address damages in their Rule 50(a) motion regarding GSCO's tortious interference claims, (*see* Doc. 317 at 149-50).  Therefore, the court will consider the issue to the extent Defendants raised it under Rule 50(a) and renewed it under Rule 50(b), even if Defendants renewed it merely by incorporation.

sufficient evidence supporting the jury's verdict.[29]   (*See* Doc. 260 at 14-16, 18-19.)

Specifically, Defendants contend that "Deboer's damage calculation [for GSCO's lost

profits] was 'unreliable because of an unrefuted foundational factual flaw in his underlying

assumptions–the assumption that, but for some unknown and undisclosed reason, the

attendees would have gone to the GSCO convention rather than to the FNAWS one.'" (*Id.*

at 15 (quoting Doc. 223 at 11).)  However, as GSCO notes, Judge Hopkins "already decided

this issue in [GSCO's] favor."  (Doc. 272 at 13.)  In fact, Judge Hopkins required that Mr.

DeBoer testify outside the jury's presence in order to determine whether to allow his

testimony.  (*See* Doc. 315 at 215-71.)  At that time, as GSCO again points out, Mr. DeBoer

---

[29] Mr. DeBoer testified extensively as to the damages GSCO incurred from Defendants' tortious interference.  (*See* Doc. 272 at 14-18, 22-23; Doc. 317 at 56:16-58:5.)  For example, as GSCO argues, Mr. DeBoer testified how Defendants tortiously interfered with GSCO's business relations by infringing GSCO's trademarks, explaining that GSCO suffered "reputational damage" from Defendants' infringement, and "to reduce the effect of Defendants' infringement," adopted a "corrective advertising plan."  (Doc. 272 at 12; Doc. 317 at 45:9-16.)  And while Mr. DeBoer could not specify an exact amount regarding the damage to GSCO's reputation, he did testify that the costs of the corrective advertising plan totaled $622,433 over a three year period.  (Doc. 317 at 45:21-24, 51:13-56:1.)  Also, Mr. DeBoer testified that Defendants' infringement caused GSCO to lose profits because it lost convention attendees.  (*Id.* at 45:9-14; Doc. 272 at 13-16.)  According to Mr. DeBoer, GSCO's damages for those lost attendees amounted to $3,344,146, which GSCO incurred from 2005 through 2008.  (Doc. 317 at 51:4-8.)

Apart from Defendants' infringement, Mr. DeBoer also discussed the damages GSCO incurred from Defendants' double-booking its 2008 convention.  (*See id.* at 28:18-43:6.)  He stated that FNAWS sent GSCO an email stating that FNAWS was holding its convention from January 28, 2008 through February 2nd, and that GSCO relied on those dates when scheduling its own convention from February 7, 2008 through February 10th.  (*See id.* at 37:10-41:3; Pl.'s Trial Ex. 226.)  Mr. DeBoer testified that FNAWS later changed the dates of its convention, causing an overlap with GSCO's convention.  (Doc. 317 at 39:3-18.)  As a result, GSCO could not fill all of the hotel rooms it had initially set aside for attendees, triggering the "attrition provision" of GSCO's contract with the hotel.  (*See id.* at 41:7-42:23.)  According to Mr. DeBoer, GSCO paid $71,375 in liquidated damages under that provision.  (*Id.* at 42:23.)

offered a link between Defendants' infringement and GSCO's lost convention attendees; he explained that by infringing GSCO's "3/4 Slam" mark and offering a "3/4 Slam raffle," and by misappropriating GSCO's list of individuals eligible for the raffle, Defendants effectively lured people to their convention.  (*See id.* at 244-45; Doc. 272 at 13-14.)  He opined that if Defendants did not offer a 3/4 Slam raffle at their convention, that it would "dramatically" effect the number of GSCO's convention attendees.[30]  (Doc. 315 at 245:3-6.)  Following the proffer, and despite Defendants' opposition, Judge Hopkins allowed Mr. DeBoer's testimony, finding that he had the requisite personal knowledge to provide a sufficient foundation for the causal link between Defendants' infringement and GSCO's lost convention attendees.[31]  (*See id.* at 281:6-17, 293:13-294:2.)  Drawing all reasonable

---

[30] When Mr. DeBoer testified before the jury, he conceded that "lots of people go to conventions for lots of different reasons," but maintained that he took that into account by identifying GSCO's lost convention attendees based on "the FNAWS magazines where they list 3/4 Slammers, 1/2 Slammers, and people who are awarded Slammers at the convention."  (Doc. 317 at 46:9-19.)  He continued:

> [T]hese particular people are segmented out because they are 3/4 Slammers, and if it wasn't for the Grand Slam Club, they wouldn't even be 3/4 Slammers.  And that's why they go to the convention is for the 3/4 Slam opportunities, and if [GSCO] were the only ones to provide it, I would have to think they would come to [GSCO's] convention.

(*Id.* at 46:19-24.)  Mr. DeBoer clarified how the 3/4 Slam raffle entices 3/4 Slammers, explaining that 3/4 Slammers can win a free hunt for whichever sheep they lack to complete a Grand Slam.  (*Id.* at 46-47.)  He stated that he had "talked to guys who have been trying 25 years to get their desert sheep.  So it's a valuable hunt.  It's very expensive.  And [the raffle] is an opportunity where in some cases they've got the best odds in the world of winning that final hunt."  (*Id.* at 47:3-7.)

[31] Judge Hopkins again rejected Defendants' arguments challenging Mr. DeBoer's testimony with respect to Defendants' Rule 50(a) motion, "find[ing] that it's a jury question as to whether or not any of these damages as to . . . tortious interference were proximately caused by any of the acts

inferences in favor of GSCO, this court agrees.  Indeed, as aforementioned, damages "need not be proved to a mathematical certainty," *Systrends, Inc.*, 959 So.2d at 1075, and a "'plaintiff will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss.'" *Parsons*, 849 So. 2d at 949 (quoting *Mannington Wood Floors, Inc. v. Port Epes Transp., Inc.*, 669 So. 2d 817, 822 (Ala. 1995)).

Still, Defendants maintain Mr. DeBoer's testimony was flawed in other ways.  (*See* Doc. 260 at 15-18.)  For example, Defendants complain that Mr. DeBoer "erroneously attributed all of GSCO's convention revenue to attendees . . . failed to calculate how numbers of attendees might affect the ultimate price paid for auction items [and] also failed to determine whether the individual members he claimed did not attend GSCO's conventions actually attended FNAWS' conventions."  (Doc. 260 at 15.)  GSCO concedes that "such potentially impossible calculations could enhance the certainty of damages," but notes that it "is not required to meet this unreasonably demanding standard" because an "aggrieved plaintiff must be permitted to present its best evidence on damages and not be foreclosed from seeking damages it deserves due to difficulty of measurement."  (Doc. 272 at 15 (quoting *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 544 (5th Cir. 1974).)  Drawing all reasonable inferences in favor of GSCO, the court again agrees.[32]  And,

_____

complained of."  (Doc. 317 at 181:21-24.)

[32] The court likewise rejects Defendants' argument that Mr. DeBoer's "other testimonial evidence of damages constituted nothing more than unsubstantiated, self-serving speculations of

at any rate, Defendants had ample opportunity to cast doubt on Mr. DeBoer's testimony during their cross-examination, which the jury indeed heard and could have considered during deliberations.  (*See* Doc. 317 at 62-123, 128-129.)  Therefore, the court finds Defendants' opposition to Mr. DeBoer's testimony to be unavailing.

Notwithstanding their arguments as to Mr. DeBoer's testimony, Defendants also contend that the award of damages for GSCO's tortious interference claims are "clearly duplicative" of its trademark infringement damages, and therefore are unrecoverable.  (Doc. 278 at 9-10.)  However, Defendants have waived this argument under Rule 50(b) by failing to raise it during their Rule 50(a) motion.[33]  (*See* Doc. 317 at 149-50.)  Simply put, drawing all reasonable inferences in favor of GSCO, the court finds that GSCO presented legally sufficient evidence of damages to support the jury's verdict with respect to its tortious interference claims.

---

possible future damage, including speculations regarding a proposed marketing plan . . . and the payment of a deposit that might result in a future loss if GSCO failed to meet its projected hotel booking for its 2008 convention."  (Doc. 260 at 16.)  As GSCO states, Defendants' arguments "are not in accord with the evidence adduced at trial," and "[b]ased on this evidence, the jury was entitled to award these damages if it so chose."  (*See* Doc. 272 at 16-18.)  Indeed, the jury instructions specified that the "verdict must not be based upon mere speculation, conjecture, or guesswork," detailed the necessity of proximate cause, and for "prospective costs" made clear that the jury's award "should not exceed the actual damage to the value of the plaintiff's mark at the time of the infringement by the defendants."  (Doc. 234 at 34-35, 46-47.)

[33] The merits of Defendants' argument is likewise unavailing.  *See infra* Part II.D.2.a.(3).

d.      *GSCO's Intentional Interference with Business Relations Claims*

Finally, Defendants contend they are entitled to judgment as a matter of law pursuant to Rule 50(b) with regard to GSCO's intentional interference with business relations claims because "[n]ot only did GSCO fail to present any legally sufficient evidence on the essential element of damages . . . but also it failed to present any evidence upon which a reasonable jury could have found any of the other requisite elements of intentional interference." (Doc. 260 at 19-20.)  In response, GSCO asserts that "the element of damages is the only grounds on which Defendants sought judgment as a matter of law on th[ese] claim[s] in their Rule 50(a) motions prior to the jury verdict." (Doc. 272 at 24.)  GSCO is correct. (*See* Doc. 317 at 149-50.)  Accordingly, Defendants have waived those other grounds.[34]  *See Shannon*, 292 F.3d at 717 n.3.  And, because the court herein rejected Defendants' Rule 50(b) argument regarding damages, *see supra* Part II.C.2.c, the court finds that Defendants' Post-Judgment Motion Pursuant to Fed. R. Civ. P. 50(b) is due to be denied as to GSCO's tortious interference with business relations claims.

**D.      DEFENDANTS' POST-JUDGMENT MOTION PURSUANT TO FED. R. CIV. P. 59 (DOC. 259)**

Pursuant to Fed. R. Civ. P. 59, Defendants moved the court "for an order granting a new trial or, in the alternative, for an order altering or amending the judgment and remitting the jury's verdict." (Doc. 259 at 2.)  Also, "Defendants move[d] pursuant to Fed. R. Civ. P.

---

[34] Those grounds are also without merit.  *See infra* Part II.D.2.a.(3).

59(a)(2) in the alternative to their motion for relief pursuant to Fed. R. Civ. P. 52 for a rehearing on those issues not submitted to the jury." (*Id.* at 3.)  In support of the motion, Defendants filed an accompanying brief.  (Doc. 261.)  GSCO filed an Opposition to Defendants' Post-Judgment Motion Pursuant to Rule 59, (doc. 273), to which defendants replied.  (Doc. 279.)

1.   <u>STANDARD OF REVIEW UNDER RULE 59</u>

Fed. R. Civ. P. 59 details the procedure by which a court may grant a new trial or alter or amend a judgment.  Rule 59(a) states the general rules for granting a new trial:

> **(a) In General.**
> **(1) *Grounds for New Trial.*** The court may, on motion, grant a new trial on all or some of the issues–and to any party–as follows:
> > **(A)** after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or
> > **(B)** after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court.
> **(2)** ***Further Action After a Nonjury Trial.*** After a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment.

Fed. R. Civ. P. 59(a).  Clarifying the rule, the Eleventh Circuit has stated that "[w]hen ruling on a motion for a new trial, a trial judge must determine [whether] 'the verdict is against the clear weight of the evidence . . . or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of the verdict.'"  *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984) (quoting *United States v. Bucon*

*Constr. Co.*, 430 F.2d 420, 423 (5th Cir. 1970)).  "'[N]ew trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great–not merely the greater–weight of the evidence.'"  *Id.* (quoting *Conway v. Chem. Leaman Tank Lines, Inc.*, 610 F.2d 360, 363 (5th Cir. 1980)).  Also, "[w]here conflicting testimony is presented and the jury is called upon to make credibility determinations and to weigh the evidence, [the court should] uphold the verdict as long as there is some support for the jury's decision." *See Quick v. Birmingham*, 346 F. App'x 494, 495 (11th Cir. 2009) (citing *Rosenfield v. Wellington Leisure Prods., Inc.*, 827 F.2d 1493, 1498 (11th Cir. 1987)).  This is because a court "should not substitute [its] own credibility choices and inferences for the reasonable credibility choices and inferences made by the jury." *Rosenfield*, 827 F.2d at 1498 (citing *Williams v. Valdosta*, 689 F.2d 964, 973 (11th Cir. 1982)).

2.   DEFENDANTS' ARGUMENTS UNDER RULE 59

Under Rule 59, Defendants argue they are entitled to a new trial because: (a) the verdict "is contrary to the clear weight of the evidence," (b) the jury awarded excessive damages, (c) "incompetent and wholly speculative evidence of GSCO's damages was erroneously submitted to the jury," (d) "the instructions to the jury were erroneous and incomplete such that the jury was not properly guided in its deliberations," and (e) "the jury failed to follow or did not understand" the jury instructions.  (Doc. 261 at 1-3.)

Alternatively, Defendants request that the court (f) "excise from the judgment the compensatory damages awarded to GSCO for Defendants' alleged tortious interference," which Defendants maintain "are duplicative of the award for trademark infringement and unfair competition."  (*Id.* at 3.)  Defendants likewise state "[t]he $100,000 award for copyright infringement must also be excised . . . because GSCO did not prove at the trial that it was entitled to statutory damages."  (*Id.*)  Next, Defendants request that the court (g) "alter or amend the permanent injunction entered against them because it is insufficiently specific, overly broad, and enjoins Defendants from pursuing legal entitlements."  (*Id.*)  Defendants also (h) "move for remittitur," claiming "[t]he compensatory damages are excessive" and that "the punitive damages awarded . . . do not conform with the requirements of due process." (*Id.* at 3-4.)

Finally, Defendants (i) "move pursuant to Fed. R. Civ. P. 59(a)(2) in the alternative to their motion for relief pursuant to Fed. R. Civ. P. 52 for a rehearing on those issues not submitted to the jury," i.e. their equitable defenses and cancellation counterclaim.  (*Id.* at 3.)

a.     *The Weight of the Evidence*

Defendants first maintain they are entitled to a new trial because the verdict is against the great weight of the evidence with respect to GSCO's: (1) trademark and unfair

46

competition claims, (2) copyright infringement claims, and (3) tortious interference claims.[35]

(*Id.* at 5-8.)

(1).   GSCO's trademark and unfair competition claims

As to GSCO's trademark and unfair competition claims, Defendants argue that:

The weight of evidence at trial proved that: (1) GSCO's claimed predecessor abandoned GRAND SLAM and GRAND SLAM OF NORTH AMERICAN WILD SHEEP through naked licensing when it granted an oral license to third-party Safari Club International in the early 1980s without limitation and without any effort at quality control; (2) the claimed marks are invalid generic marks or, at best, descriptive marks lacking secondary meaning; (3) GSCO was not the first to use the claimed marks; (4) Defendants' use of the claimed marks does not give rise to a likelihood of confusion - on the contrary, the evidence at trial was that no one is confused about the parties and the goods and services they offer; and (5) GSCO has not been damaged by Defendants' use of the claimed marks.

(*Id.* at 6 (internal footnotes omitted).)

_____

[35] GSCO argues that "Defendants do not refer to any evidence, either by citation or description, nor do they provide any legal authority to support their argument" that the verdict is against the great weight of the evidence. (Doc. 273 at 3.) Thus, GSCO insists that "[s]uch a blanket and unsupported method of raising issues should be summarily denied [as failing] to satisfy the pleading requirement imposed by Rule 7(b) of the Federal Rules of Civil Procedure." (*Id.*) Rule 7(b) in part requires that a motion "state with particularity the grounds for seeking the order." Fed. R. Civ. P. 7(b)(1)(c). That said, "[t]he purpose of Rule 7's particularity requirement is to give notice of the basis for the motion to the court and the opposing party so as to avoid prejudice." *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 793 (8th Cir. 2003) (affirming district court's decision to decide defendant's motion despite its failing to state grounds with particularity because defendant's previous motion gave district court and opposing party adequate notice of the grounds raised). Even GSCO's cited case cautions that "[t]he liberal Rules of Civil Procedure must not be transformed by judicial interpretation into technical traps for the unwary." *Butler v. Coral Volkswagen, Inc.*, 804 F.2d 612, 615 (11th Cir. 1986). Here, as in *Andreas v. Volkswagen of America, Inc.*, Defendants' brief in support of their Rule 50(b) motion addresses in detail the same issues they raise with regard to their Rule 59 motion. (*See* Doc. 260, Doc. 261 at 5-8.) What's more, Defendants specifically reference it. (Doc. 261 at 1, 5-6.) The court finds that no more is necessary to satisfy Rule 7(b).

(a).    Defendants' arguments that GSCO abandoned the marks and that the marks are generic or descriptive and lack secondary meaning

As to Defendants' initial arguments, that the weight of evidence at trial proved that GSCO's claimed predecessor abandoned the marks through naked licensing and that the marks are generic or descriptive and lack secondary meaning, the court finds both unavailing for the same reasons stated in the court's discussion regarding Defendants' Rule 50(b) motion.  *See supra* Parts II.C.2.a.(1)-(2).

(b).    Defendants' argument that GSCO was not the first to use the claimed marks

For their next argument, Defendants maintain that the weight of the evidence showed that "GSCO was not the first to use the claimed marks," (Doc. 261 at 6), implicating the first element for an infringement claim, which requires a claimant demonstrate that "it enjoys enforceable rights in its mark,"  *SunAmerica Corp.*, 77 F.3d at 1334 (citing *Conagra, Inc.*, 743 F.2d at 1512).  As stated by the Eleventh Circuit, to establish enforceable rights in a mark, aside from the requirement that the mark be distinctive, *Welding Servs.*, 509 F.3d at 1357 (quoting *Two Pesos, Inc.*, 505 U.S. at 768-69), "the plaintiff's use of the mark must [also] predate the defendant's potentially confusing mark," *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (citing *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1022 (11th Cir. 1990)).  Registering a mark on the principal register creates a presumption of the registrant's prior use of the mark for the purposes stated on the certificate, at least as to the application's filing date.  *See* 15 U.S.C. § 1115(a) (2009).

Although Defendants offer no support for their "first user" argument in their brief accompanying their Rule 59 motion other than the conclusory statement that "GSCO was not the first to use the claimed marks," (Doc. 261 at 6), Defendants do offer support in their brief accompanying their Rule 50(b) motion, (*see* Doc. 260 at 11-13). The court incorporates those arguments here to the extent that they apply.

Defendants initially maintain that "GSCO's claimed first use date for its GRAND SLAM mark for issuing publications is 1997 [sic]," long after "FNAWS and other parties [used the mark] in publications," and over forty years after Grancel Fitz first used the mark in the 1948 publication, "True Magazine."[36] (*Id.* at 11.) GSCO states that the use by Grancel Fitz was a "*non-trademark* use," and also that it presented direct evidence at trial establishing that GSCO has used the GRAND SLAM MARK for issuing publications since "at least 1967," making the first use date of 1992, as stated on the registration certificate, immaterial. (Doc. 272 at 9, Doc. 273 at 7.) GSCO is correct. Indeed, it is irrelevant that Grancel Fitz used the mark in 1948 because only Defendants' use of the mark matters for priority. *See Leigh*, 212 F.3d at 1217; *see also Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 820 (9th Cir. 1996) ("[A] third party's prior use of a trademark is not a defense in an infringement action . . . ."). The court also rejects Defendants' contention that the registration certificate's first use date of 1992 establishes when GSCO first used its GRAND SLAM mark for issuing publications. *See Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*,

---

[36] According to GSCO's registration certificate, the first use date for its GRAND SLAM mark for issuing publications is 1992. (*See* Pl.'s Trial Ex. 1.)

522 F.3d 1200, 1210 (11th Cir. 2008) (holding that "because the uncontroverted testimony established . . . valid use of the mark prior to the date [listed on] its registration application, the improper first use date contained in the application cannot be a basis for invalidating the registration").  It is undisputed that Bob Housholder used the term as early as 1967 when "The Grand Slam Club," GSCO's claimed predecessor, first published its trade periodical entitled "The Grand Slam Club," ten years and seven years prior to the incorporation of FNAWS and ISHA, respectively.[37]  (*See* Doc. 234 at 10, ¶¶ 4-5.)  At trial, Dennis Campbell testified to that effect and also clarified that it was his understanding that the 1992 date simply referred to when GSCO changed the trade periodical's name to "Grand Slam."  (Doc. 311 at 164-167.)

Next, Defendants contend that "GSCO's claimed first use date of 1967 for its GRAND SLAM and GRAND SLAM OF NORTH AMERICAN WILD SHEEP marks for organizing conferences was false" because GSCO did not establish itself as the successor to Bob Housholder's original Grand Slam Club; Defendants argue GSCO did not use the marks for organizing conferences until "decades after FNAWS and third-parties began using the terms for [that purpose]."  (Doc. 260 at 12.)  In response, GSCO asserts that the verdict is supported by "direct evidence, both in written documents and in trial testimony of Mr. Bill Houshoulder [Bob Houshoulder's brother] and Mr. Dennis Campbell, that [GSCO] is the successor to Mr. Bob Houshoulder's Grand Slam Club."  (Doc. 273 at 7.)  The court agrees.

---

[37] Defendants do dispute, however, whether GSCO is actually the successor entity of the Grand Slam Club.  (Doc. 260 at 12-13.)

As GSCO points out, Bill Houshoulder testified that in 1989, following his brother's stroke and at his request, he began searching for someone to take control of the Grand Slam Club, eventually identifying Dennis Campbell.  (*Id.*; Doc. 311 at 105-08.)  He stated that "Bob showed a very favorable reaction to having Dennis take over the club," and that Mr. Campbell thereafter, in early 1990, took "100 percent of the Grand Slam records that [they] could locate."  (Doc. 311 at 108-09.)  Mr. Houshoulder added that he and his brother sent a newsletter to the Grand Slam Club members, dated February 23, 1990, notifying them that Mr. Campbell had taken control.  (*Id.* at 109-11; Pl.'s Trial Ex. 208-002.)  In addition to Mr. Houshoulder, Mr. Campbell likewise testified and confirmed the same sequence of events.  (*See* Doc. 311 at 134-37.)  Therefore, the court finds that GSCO presented sufficient evidence that Mr. Campbell took control of the Grand Slam Club in 1990.  As a result, the court also agrees with GSCO that "[a]s controlling officer, Mr. Campbell had authority to incorporate the Grand Slam Club and form the successor entity [GSCO]," and with that "automatically was passed the common law rights to the Grand Slam marks and the attendant goodwill of the Grand Slam Club . . . even without a written assignment."  (Doc. 273 at 7.); *see Am. Mfg. Co., v. Phase Indus., Inc.*, 192 U.S.P.Q. 498, 500 (T.T.A.B. 1976) ("Neither a formal assignment nor recordation of an assignment in the Patent and Trademark Office is necessary to pass title or ownership to common law or statutory trademark rights."); 3 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 18:37 (4th ed. 1996) (stating that "a merger of one corporation into another effects a presumed passage of all common law and

federally registered trademark rights to the acquiring corporation without the need for a formal assignment or its recordation").

Lastly, Defendants insist that "GSCO's claims based upon its CAPRA WORLD SLAM and OVIS WORLD SLAM marks fail because the evidence was undisputed that ISHA created the concept of a worldwide slam when it instituted the 'Super Slam' of wild sheep of the world in 1975 and began issuing 'Super Slam' awards."[38]  (Doc. 260 at 13.) Defendants argue that the "evidence at trial was that [GSCO] began using the claimed terms . . . more than a quarter of a century later to recognize the same world hunting achievement."[39]  (*Id.*)  On the other hand, GSCO maintains that ISHA abandoned use of the "Super Slam" term "many years before ISHA 'merged' with FNAWS." (Doc. 272 at 8 n.5.) The Eleventh Circuit has made clear that a "trademark is deemed abandoned, and, thus no longer valid, 'when its use has been discontinued with intent not to resume such use.'" *Nat'l Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1329 (11th Cir. 2008) (quoting 15 U.S.C. § 1127); *see also Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d

---

[38] Defendants add that GSCO offered "no evidence at trial that Defendants ever used the term OVIS WORLD SLAM or any similar term or made any use of the terms OVIS or WORLD in connection or association with the word SLAM."  (Doc. 260 at 13.)  Notwithstanding the fact that Defendants have acknowledged that the OVIS WORLD SLAM mark constitutes a derivative of the GRAND SLAM and GRAND SLAM OF NORTH AMERICAN WILD SHEEP marks, (Doc. 252 at 11), or the fact that Defendants' argument is irrelevant as to whether GSCO was the first to use the mark, the argument is also overly narrow.  The "similarity of the infringed and infringing marks" is one of seven factors under the Eleventh Circuit's "likelihood of confusion" test, *Welding Servs., Inc.*, 509 F.3d at 1360, and one of eight factors pursuant to the jury instructions (Doc. 234 at 27-29).

[39] GSCO registered its OVIS WORLD SLAM mark on July 25, 2005 and its CAPRA WORLD SLAM mark on February 6, 2007, specifying first use dates for the marks as 1997 and 2001, respectively.  (*See* Pl.'s Trial Exs. 1 & 2.)

52

1167, 1173 (11th Cir. 2002) (stating that a party is free to use a mark that has been abandoned without incurring liability). What's more, "[n]onuse [of a mark] for 3 consecutive years [is] prima facie evidence of abandonment." *See* 15 U.S.C. § 1127(a) (2009).

Here, GSCO argues that it demonstrated ISHA's abandonment of the Super Slam term through direct evidence. (Doc. 272 at 8 n.5.) Specifically, GSCO claims that "[ISHA's] corporate status [has been] revoked since August of 2000, with six years of tax returns (2001-06) showing $0 income back-filed by FNAWS."[40] (*See* Doc. 272 at 8 n.5; Pl.'s Trial Exs. 150, 207 & 642.) GSCO also points to the testimony of Hugh Jacks, a "life member" of ISHA. (Doc. 272 at 8 n.5; Doc. 316 at 150:19-23.) Mr. Jacks testified that it had been "several years probably" since he received any newsletters or communications from ISHA, noting that he had not received anything from the organization since paying $500 in dues to become a life member. (Doc. 316 at 151:2-12.) He confirmed that the last communication from ISHA "would . . . have been just some time before" the death of its president, Joe Quarto, who passed away in January of 2004. (Doc. 316 at 151:13-19.) Mr. Campbell testified as well, and clarified on redirect that the last magazine ISHA published was its 2002 issue of the "ISHA Ram"; he added that FNAWS did not devote a section of its "Wild

---

[40] To be exact, ISHA's tax returns for 2001 to 2006 do show $0 gross receipts for the years 2000, 2005, and 2006, (Pl.'s Trial Exs. 150-001, 150-030 & 642), but in contrast show gross receipts of $137,755 for 2001, (Pl.'s Trial Ex. 150-003), $66,304 for 2002, (Pl.'s Trial Ex. 150-004), $35,623 for 2003, (Pl.'s Trial Ex. 150-005), and $6,337 for 2004, (Pl.'s Trial Ex. 150-026). Nevertheless, the returns were indeed back-filed by FNAWS, indicate that the gross receipts resulted almost exclusively from direct public support, and show that ISHA received no income from membership dues and assessments during those years. (*See* Pl.'s Trial Ex. 150.)

Sheep" magazine to ISHA until its Fall 2005 issue, and did not publish a version of ISHA's Super Slam document until its Fall 2006 issue. (*See* Doc. 316 at 132:21-133:18; Pl.'s Trial Exs. 523 & 528.) Later, Mr. Campbell testified that following ISHA's last issue in 2002, "the functions of that organization . . . the actual documentation and functions of that nature had all but ceased."[41] (Doc. 319 at 117:22-118:1.)

Defendants do not address GSCO's argument that ISHA abandoned its use of the Super Slam term in their reply brief, (Doc. 278), or in either of their briefs regarding their Rule 59 motion (Doc. 261, Doc. 279).[42] Also, when cross-examining Mr. Jacks, Defendants did not address his testimony regarding when he last received communications from ISHA, but instead had Mr. Jacks confirm that he received ISHA's Super Slam award prior to receiving GSCO's Ovis World Slam.[43] (*See* Doc. 316 at 205:7-19.) During their recross of Mr. Campbell, Defendants similarly did not challenge the testimony he gave on redirect regarding the dates or contents of ISHA and FNAWS' publications. (*See id.* at 146:18-

---

[41] In fact, in the Fall 2006 issue of "Wild Sheep," Ray Lee, who had by then assumed the position as ISHA's president, advertised that "[y]ou'll remember that ISHA had not been too active for several years and there is not much recent information in the files. So if you've been actively hunting the last few years - and I certainly hope so - we may not have your most current records." (Pl.'s Trial Ex. 40.) Judge Hopkins admitted the advertisement into evidence. (*Id.*)

[42] While Defendants did deny that ISHA had abandoned its intellectual property rights in their Amended Answer, that denial has no bearing as to whether the verdict is against the clear weight of the evidence. (Doc. 37 at 2, ¶ 3.)

[43] That admission is irrelevant, however, as to whether ISHA abandoned the Super Slam term because the jury could have reasonably found that ISHA abandoned the term only after Mr. Jacks received his Super Slam award. Indeed, Mr. Jacks did not state the date he received it. (*See* Doc. 316 at 205:7-19.)

147:4)  As a result, the court finds sufficient support in the record that ISHA had abandoned

the Super Slam term before GSCO obtained trademark protection for the CAPRA WORLD

SLAM and OVIS WORLD SLAM marks.  Defendants' claim that the weight of the evidence

proved that GSCO was not the first to use the claimed marks is therefore without merit.

(c).    Defendants' argument that its use of the claimed marks does not give rise to a
        likelihood of confusion

        Defendants also assert that the weight of the evidence demonstrated that "Defendants'

use of the claimed marks does not give rise to a likelihood of confusion."  (Doc. 261 at 6.)

The argument addresses the second requirement for a trademark infringement suit in that "the

alleged infringer [must have] adopted a mark that is the same or confusingly similar."

*SunAmerica Corp.*, 77 F.3d at 1334 (citing *Conagra, Inc.*, 743 F.2d at 1512).  The Eleventh

Circuit has focused that determination by identifying seven factors relevant in establishing

a likelihood of confusion among consumers:

> (1) distinctiveness of the mark alleged to have been infringed; (2) similarity of the
> infringed and infringing marks; (3) similarity between the goods or services offered
> under the two marks; (4) similarity of the actual sales methods used by the two
> parties, such as their sales outlets and customer base; (5) similarity of advertising
> methods; (6) intent of the alleged infringer to misappropriate the proprietor's good
> will; and (7) existence and extent of actual confusion in the consuming public.[44]

---

[44] In the instant case, the jury instructions included these seven factors and also added two
additional factors, which made relevant the "consumer's degree of care" and "the breach of the
[2005] license agreement."  (Doc. 234 at 29.)  The former instruction advised the jury that "[t]he
more sophisticated the potential buyers of the goods or the more costly the goods, the more careful
and discriminating the reasonably prudent consumer exercising ordinary caution may be.  They may
be less likely to be confused by similarities in the plaintiff's and defendants' marks."  (*Id.*)  The latter

*Welding Servs., Inc.*, 509 F.3d at 1360 (citing *Conagra, Inc.*, 743 F.2d at 1514).  "Of these, the type of mark and the evidence of actual confusion are the most important."  *Frehling Enters. Inc. v. Int'l Select Group Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999) (citing *Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 326 (11th Cir. 1989)).

To find support for Defendants' argument, the court again looks to Defendants' brief in support of their Rule 50(b) motion.  (*See* Doc. 260 at 13-14.)  Defendants contend that their use of GSCO's claimed marks does not give rise to a likelihood of confusion because the marks are "inherently weak due to the longstanding and widespread use by third parties . . . and because the relevant market comprises people with highly particularized skill, knowledge, expertise, and sophistication."  (*Id.*)  Defendants also point out that they "presented testimony and other evidence that GSCO members are not confused about the parties or their goods and services."  (*Id.*)  By contrast, GSCO emphasizes that "[t]he jury heard all of Defendants' evidence [but determined] that the Grand Slam marks are valid and infringed," and insist that "[s]ubstantial evidence supports" that decision.  (Doc. 273 at 6.)  In fact, GSCO claims that "confusion is inevitable in this case with Defendants offering the same goods/services (*e.g.* sheep and goat hunting awards, drawings/raffles, and conventions) through the same channels (sheep and goat hunting community) under the same Grand Slam marks."  (*Id.* at 6-7.)

─────────────

instruction informed the jury that if GSCO established that Defendants "knowingly breached" the 2005 Agreement, then the jury could find a likelihood of confusion as to GSCO's GRAND SLAM OF NORTH AMERICAN WILD SHEEP mark.  (*Id.*)

GSCO is correct that the parties offer the same goods and services to overlapping memberships. (*See* Doc. 37 at 12, ¶ 33, 13-14, ¶¶ 41-43.)  It is likewise undisputed that the parties have used many of the same marks. (*Id.* at 13-14, ¶¶ 41-43.)  Moreover, the court also agrees that GSCO presented evidence at trial probative of Defendants' infringement and a likelihood of confusion, including many of the exhibits introduced during Mr. Campbell's testimony, as well as the testimony itself.[45]   (*See* Doc. 314 at 26-30.)  For instance, Mr. Campbell testified that the Summer 2004 issue of "Wild Sheep" contained several instances of infringement, including one passage where Defendants advertised that, "[a]s we have been doing for decades, those hunters who accomplished the Grand Slam of North America's Wild Sheep will be recognized at our awards ceremony." (Doc. 311 at 178:8-180:12.)  Mr. Campbell stated that the passage constituted infringement because "they used Grand Slam of North American Wild Sheep in a confusing way attributing it to themselves." (*Id.* at 180:18-19.)    Additionally, as GSCO notes, it submitted testimony that FNAWS "misappropriated [GSCO's] membership list . . . and advertised that list as owned by Defendants," as well as evidence that FNAWS continued infringing GSCO's marks despite receiving two cease-and-desist letters from GSCO. (*See* Doc. 314 at 29; Pl.'s Trial Exs. 224, 47 & 240.)  And finally, detailed above pursuant to Defendants' Rule 50(b) motion, *supra* Part II.C.2.a.(2), GSCO submitted evidence demonstrating several instances of actual

---

[45] Specifically, GSCO introduced, *inter alia*, plaintiff's trial exhibits 515, 523, 524, and 528, referencing the Summer 2004, Fall 2005, Winter 2005-2006, and Fall 2006 issues of "Wild Sheep," respectively. (Doc. 314 at 28.)

confusion, "the best evidence of a likelihood of confusion." *Frehling Enters. Inc.*, 192 F.3d at 1340 (citing *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 978 (11th Cir. 1983)).  Thus, even though Defendants presented evidence indicating that their use of the claimed marks does not give rise to a likelihood of confusion, GSCO presented substantial evidence that it does.  (*See* Doc. 272 at 6-8; Doc. 273 at 6-7; Doc. 314 at 26-30.)  *See also Quick*, 346 F. App'x at 495 ("Where conflicting testimony is presented and the jury is called upon to make credibility determinations and to weigh the evidence, [the court should] uphold the verdict as long as there is some support for the jury's decision." (citing *Rosenfield*, 827 F.2d at 1498)).  For that reason, the court rejects Defendants' argument that the weight of the evidence at trial proved that Defendants' use of the claimed marks does not give rise to a likelihood of confusion.

(d).    Defendants' argument that GSCO has not been damaged by Defendants' use of the claimed marks

Finally, Defendants advocate that the weight of the evidence demonstrated that "GSCO has not been damaged by Defendants' use of the claimed marks."  (Doc. 261 at 6.) Under the Lanham Act, "damages for trademark infringement may include (1) the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1564 (11th Cir. 1986) (citing 15 U.S.C. § 1117).  What's more, "[u]nlike in the case of future lost profits caused by breach of contract, 'Lanham Act damages may be awarded even when they are not

susceptible to precise calculations.'" *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1241 (11th Cir. 2008) (quoting *Ramada Inns, Inc.*, 804 F.2d at 1565.)  The Eleventh Circuit explained:

> Where the wrong is of such a nature as to preclude exact ascertainment of the amount of damages, plaintiff may recover upon a showing of the extent of damages as a matter of just and reasonable inference, although the result may be only an approximation.  The wrongdoer may not complain of inexactness where his actions preclude precise computation of the extent of the injury.

*Ramada Inns, Inc.*, 804 F.2d at 1565 (quoting *Bangor Punta Operations v. Universal Marine Co.*, 543 F.2d 1107, 1110-11 (5th Cir. 1976)) (internal citations omitted).

In the instant case, the jury received detailed instructions regarding trademark damages, including a specific instruction that the "verdict must not be based upon mere speculation, conjecture, or guesswork, but must be based upon the evidence and the just and reasonable inferences shown thereby."  (Doc. 234 at 34-36.)  Still, the jury awarded GSCO $1,000,000 for Defendants' trademark infringement,  (Doc. 235 at Question I.4), which GSCO points out "totaled significantly less than the evidence of damages [it] presented," (Doc. 273 at 9).

Defendants refer to their "discussion below herein regarding lack of causation evidence at trial and regarding GSCO's wholly speculative evidence of damages" as support for their argument, presumably incorporating several arguments raised in sections C and D of their brief, i.e. their second and third grounds for a new trial.  (*See* Doc. 261 at 6 n.2, 8-18.)  Primarily though, Defendants argue that "[t]he only evidence adduced on the subject

of money damages was testimony by Taylor DeBoer," which they reiterate the court should

have excluded because "there was no causal link between the purported damage and

Defendants' actions," noting that "a lay witness cannot offer facts and opinion lacking proper

foundation." (*Id.* at 17.)  However, the court has already rejected this argument, as well as

Defendants' other arguments challenging Mr. DeBoer's testimony, under Defendants' Rule

50(b) motion with respect to GSCO's tortious interference claims; for the same reasons the

court rejects the arguments here as well.[46]  *See supra* Part II.C.2.c.  As a result, based on Mr.

DeBoer's testimony, the jury could have awarded GSCO almost $4 million in actual damages

for Defendants' infringement.[47]  (*See* Doc. 317 at 56:19-57:23.)  What's more, as GSCO

notes, "based on a finding that Defendants had 'willfully infringed,'"[48] the jury could have

---

[46] Thus, Defendants' related argument, that "[b]ecause GSCO's evidence of its alleged damages flowing from Defendants' alleged trademark infringement and unfair competition was wholly speculative, the weight of the evidence at trial proved that GSCO was not damaged by Defendants' alleged breach of contract or alleged tortious interference," necessarily fails as well. (Doc. 261 at 6.)

[47] Particularly, Mr. DeBoer gave testimony that Defendants' infringement caused GSCO to lose convention attendees, which resulted in $3,344,146 in lost profits from 2006 to 2008. (Doc. 317 at 45:9-16, 51:4-8.)  He also testified that GSCO is "going to suffer damage out to the future [from Defendants' infringement] that's going to require corrective advertising," and that GSCO therefore adopted a $622,433 corrective advertising plan. (*Id.* at 45:9-20, 51:13-56:1.)  Finally, Mr. DeBoer testified that Defendants' infringement caused damage to GSCO's reputation, though he admitted he could not "put a specific value on that damage." (*Id.* at 45:9-46:2.)  "The injury to or loss of the plaintiff's reputation" remained a proper basis for actual damages, however, which the jury could have awarded in an amount that would "reasonably and fairly compensate [GSCO]." (Doc. 234 at 34.)

[48] Defendants argue that the jury could not have found "willful" infringement based on the evidence at trial. (*See* Doc. 261 at 10.)  For the reasons stated in the court's discussion of whether the jury awarded excessive damages, however, the court disagrees.  *See infra* Part II.D.2.b.

awarded GSCO up to an additional $8,549,262, representing "Defendants' convention revenues for the fiscal years ending in 2005-2007." (*See* Doc. 273 at 10; Pl.'s Trial Exs. 621 & 643.)  Therefore, because the jury's award amounts to only a small percentage of the up to $12.5 million specifically requested by GSCO, the court finds Defendants' argument that the weight of the evidence proved that "GSCO has not been damaged by Defendants' use of the claimed marks" to be without merit.  Having therefore rejected all of Defendants' underlying arguments, the court is of the opinion that the jury's verdict with respect to GSCO's trademark and unfair competition claims is not against the great weight of the evidence.

(2).   GSCO's copyright infringement claims

Defendants also maintain that the jury's verdict is against the great weight of the evidence with respect to GSCO's copyright claims. (Doc. 261 at 7.)  Specifically, they argue that they copied "no original expression" from GSCO.  (*Id.*)

The Copyright Act of 1976 extends protection to "original works of authorship fixed in any tangible medium of expression."  17 § U.S.C. 102(a) (2009).  To establish copyright infringement under the Act, the copyright holder must demonstrate "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Feist Publ'ns Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 548 (1985)).  Facts, however, "are never

original," and "[t]hat there can be no valid copyright in facts is universally understood." *Id.*

at 344-45, 360 (citing § 102(b)).  "Factual compilations, on the other hand, may possess the

requisite originality . . . if [the compilation] features an original selection or arrangement of

facts, but the copyright is limited to the particular selection or arrangement." *Id.* at 348, 350-

51."[49]  And while "originality is not a stringent standard [and] does not require that facts be

presented in an innovative or surprising way . . . the selection and arrangement of facts

cannot be so mechanical or routine as to require no creativity whatsoever." *Id.* at 362-63

(holding that telephone company's white pages directory was "devoid of even the slightest

trace of creativity" because the company "simply [took] the data provided by its subscribers

and list[ed] it alphabetically by surname").  Instead, "some minimal degree of creativity"

must exist. *Id.* at 362.

In the instant case, Defendants argue that "the weight of the evidence at trial proved

that Defendants' allegedly infringing forms [i.e. Defendants' "ISHA Super SLAM" and

"ISHA Capra SLAM" forms] contain no original expression that was copied from GSCO,"

i.e. GSCO's "OVIS World Slam" and "CAPRA World Slam" forms.  (Doc. 261 at 7; Pl.'s

Trial Exs. 295, 295-A, 303 & 303-A.)  Specifically, Defendants assert that:

> Once unprotectable elements are stripped from the forms – particularly, the idea that
> the achievement of killing twelve of the legally huntable species of wild goat or
> sheep should be celebrated and recognized, the identity of the legally huntable wild
> goats and sheep in the world, and the idea of organizing wild goats and sheep in

---

[49] The Copyright Act defines a "compilation" to be "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101.

categories generally consistent with sensible and obvious groupings such as Snow
Sheep or Ibex – there is nothing substantially similar about Defendants' forms.

(Doc. 261 at 7.)  Defendants contend that without those elements, the "overall appearances

of the forms – the fonts, layout, and the graphics – are dissimilar," as well as "the verbiage

contained within the forms."  (*Id.*)  In sum, Defendants' argument focuses on the second

element for a copyright infringement claim, i.e. there are no elements of the work that are

original.

In response, GSCO points out that "[t]he jury heard all of the evidence and found that

Defendants had infringed [GSCO's] copyrighted works."  (Doc. 273 at 8.)  GSCO adds that

"[t]here is substantial evidence supporting this jury finding, including the un-rebutted

testimony of Mr. Campbell that prior to FNAWS' 'merger' with ISHA, neither ISHA nor

FNAWS had ever published anything like" GSCO's OVIS World Slam and CAPRA World

Slam forms, which GSCO copyrighted in October and December of 2006, respectively.[50]

(*Id.*; Pl.'s Trial Exs. 8, 9, 13 & 14.)  GSCO contends that Defendants infringed these forms

by copying the "unique selection and arrangement of species as well as the document layout,

including the look, feel, headers, and footers."  (Doc. 273 at 9.)  As a result, GSCO insists

that "[t]he jury's decision must stand as a reasonable decision based on the evidence and after

considering the arguments of each side."  (*Id.*)  The court agrees.

_____

[50] GSCO concedes that ISHA published a "Super Slam" document in 1998, but maintains that
"[t]he unrebutted evidence at trial . . . established that the . . . document . . . was dramatically
different than [Defendants' "ISHA Super Slam" form], which copied and mimicked GSCO's OVIS
WORLD SLAM copyrighted document."  (Doc. 314 at 38.)

Particularly, the court finds relevant the testimony of Mr. Campbell, GSCO's primary witness regarding its copyright claims. (*See* Doc. 315 at 24:21-37:3.) Mr. Campbell testified that GSCO had obtained copyright certificates for its OVIS World Slam and CAPRA World Slam forms, and pointed out the "very similar look" of Defendants' forms. (*Id.* at 26:21-25, 29:5-6, 33:12-18, 35:14; Doc. 311 at 175:13-177:4; Pl.'s Trial Exs. 8, 9, 13 & 14.) Moreover, though, he explained how GSCO arranged the different subspecies listed on the forms, grouping them by type. (Doc. 315 at 27:9-22, 34:5-17.) As to its OVIS World Slam form, he stated that "[t]he North American sheep are grouped together," as are the "Argalis," the "Urials," the "Snow Sheep," the "Blue Sheep," the "Mouflons," and the "Turs." (Doc. 315 at 27:9-22.) He mentioned though that "[t]he Aoudads [or] Barbary sheep is by itself because there's no other animal like it." (*Id.* at 27:20-21.) Mr. Campbell noted that Defendants' ISHA Super SLAM form arranged the subspecies of sheep in the same way, the first time Defendants had done so with the exception of the North American. (*Id.* at 27:9-25.) Regarding GSCO's CAPRA World Slam form, Mr. Campbell similarly testified that GSCO grouped the "Ibex" together, as well as the "Chamois," the "Tahrs," the "Turs," and the Markhor," and added that the "American Mountain Goat, since there's no other animal like this was by itself." (*Id.* at 34:5-17.) He maintained that Defendants "had never, never published anything like this before," and that "[t]he animals [on Defendants' ISHA Capra SLAM form] were grouped exactly the same or practically the same." (*Id.* at 34:8-12.)

As stated above, however, Defendants argue that GSCO's arrangement of the different subspecies listed on the forms is "sensible and obvious," and therefore unoriginal and unprotectable.  (*See* Doc. 261 at 7.)  But, a factual compilation's arrangement need not be "innovative or surprising" to satisfy the "low" standard of originality.  *Feist*, 499 U.S. at 362.  And although grouping the "Kuruktag argali" with the "Karaganda argali," for example, may seem sensible and obvious, Mr. Campbell's testimony provided substantial evidence that it nevertheless entailed "some minimal degree of creativity."  *Id.*  In fact, ISHA's 1998 Super Slam document did not group the Kuruktag argali and the Karaganda argali together, whereas Defendants' ISHA Super SLAM form, published after GSCO's OVIS World Slam form, did.  (*See* Pl.'s Trial Exs. 294, 294-A, 295 & 295-A.)

At any rate, Mr. Campbell also discussed GSCO's selection of the different subspecies listed on the two forms.  (*Id.* at 28:1-29:8, 34:18-35:18.)  As to its OVIS World Slam form, he highlighted GSCO's selection of the "Kuban Wester Tur," the "Mid-Caucasian Tur," and the "Helen Shan Blue Sheep."  (*Id.* at 28:3-29:8.)  He noted that GSCO was the only organization that had recognized the three species, and that it even received criticism in response to the selection.  (*Id.* at 28:13-29:8.)  Mr. Campbell showed how Defendants selected and included the same three species in their ISHA Super Slam form, which he expressed was the first time they had done so.  (*Id.*)  Likewise, Mr. Campbell testified that "[t]he animals [included in Defendants' ISHA Capra Slam form] were almost exactly the same that were chosen" by GSCO for its CAPRA World Slam form; he specifically pointed

to the "Persian Desert Ibex" and the "Helan Shan Blue Sheep" because GSCO was the first organization to recognize and include them.  (*Id.* at 34:18-35:18.)  He added that the Persian Desert Ibex was "of special interest" because GSCO only recognized it after "doing quite a bit of research on [it], where it lived, its differences, and things of that nature."  (*Id.* at 34:18-35:4.)  Therefore, despite Defendants' suggestion that GSCO's selection of the subspecies is unoriginal, arguing that "the identity of the legally huntable wild goats and sheep in the world" is "unprotectable" and thus Defendants copied "no original expression," Mr. Campbell's testimony provided substantial evidence otherwise.  (Doc. 261 at 7.)  Based on that testimony, and because the jury received detailed instructions on copyright infringement and were able to examine and compare the forms at issue during deliberations, the court is of the opinion that the jury's verdict is not against the great weight of the evidence on GSCO's copyright claims.  (Doc. 234 at 36-41.)

(3).   GSCO's tortious interference claims

Finally, Defendants contend that the jury's verdict is against the great weight of the evidence with respect to GSCO's tortious interference with business relations claims.  (Doc. 261 at 7-8.)  Defendants assert that "the weight of the evidence at trial was that such claims are merely duplicative of [GSCO's] trademark and unfair competition claims [and] that Defendants have engaged only in legitimate conduct that protects and advances their membership."  (*Id.* at 7.)

66

Regarding their initial argument, Defendants are correct that "'no duplicating recovery of damages for the same injury may be had,'" *St. Luke's Cataract & Laser Inst. v. Sanderson*, 573 F.3d 1186, 1209 (11th Cir. 2009) (quoting *White v. United States*, 507 F.2d 1101, 1103 (5th Cir. 1975)), and that "'courts can and should preclude double recovery.'" *Id.* (quoting *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 333 (1980)). But, "[a] jury's award is not duplicative simply because it allocates damages under two distinct causes of action." *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1995) (citing *Gentile v. County of Suffolk*, 926 F.2d 142, 153-54 (2d Cir. 1991) (rejecting the argument that jury's damage award was duplicative because the jury could have merely split its total damage award between the two causes of action). Here, as GSCO points out and Defendants admit, the $1 million in compensatory damages awarded by the jury on GSCO's trademark infringement claims represents only 25% of what GSCO actually sought for Defendants' infringement. (*See* Doc. 235 at Question I.4; Doc. 314 at 31; Doc. 264 at 1.) Thus, the jury could have decided that Defendants' infringement caused $1.4 million in compensatory damages, and merely allocated that total between GSCO's trademark claims and tortious interference claims, instead of awarding duplicative damages.[51] Such an inference is supported by the jury's actual damage awards for the claims, differing by $600,000 in total amount. (*See* Doc.

---

[51] GSCO adds that "[it] has consistently maintained that Defendants tortiously interfered with its business relations in other ways" separate from Defendants' infringement, "including Defendants' deceptive double-booking of the 2008 convention; unauthorized reproduction of [GSCO's] copyrighted works; the theft and use of [GSCO's] lists; and the misrepresentations and personal attacks on Dennis Campbell at FNAWS' 2007 convention, at which many persons who were members of both [GSCO] and FNAWS were present. (Doc. 273 at 22-23.)

235 at Question I.4, Question IV.A.2.)   The court therefore finds Defendants' initial argument to be without merit.

Defendants' second argument, that they "have engaged only in legitimate conduct that protects and advances their membership," (Doc. 261 at 7), implicates the "competitor's privilege" or "justification" defense, an affirmative defense to a tortious interference claim, *see Tom's Foods, Inc. v. Carn*, 896 So. 2d 443, 457-59 (Ala. 2004).  The defense "recognizes some types of interference among rivals competing to obtain existing at-will accounts or prospective accounts," and requires proof of three elements: "(1) that the competitor engages in actions designed to further, at least in part, his own interests; (2) that those actions created no unlawful restraint of trade; and (3) that those actions do not involve wrongful means." *Id.* at 458-59.

GSCO does not address Defendants' "competitor's privilege" argument in its brief in opposition to Defendants' Rule 59 motion, (Doc. 273), but does discuss it in its brief in opposition to Defendants' Rule 50(b) motion, (Doc. 272 at 25-28).  There, GSCO argues that "Defendants' actions could not have been 'privileged.'"[52]   (*Id.* at 26.)  Essentially, GSCO

---

[52] GSCO also argues that "Defendants' justification defense is irrelevant and inapplicable" because "[n]either the Defendants' Answer nor their Answer to the Amended Complaint pleads the defense . . . nor is this defense mentioned in the Amended Pretrial Order governing this case." (Doc. 272 at 25; Doc. 17 at 18-20; Doc. 27 at 18-24; Doc. 185 at 26-28.)  So, because the defense is an affirmative defense, which must be pleaded and proved by the defendants in accordance with Fed. R. Civ. P. 8(c), GSCO maintains that Defendants have waived it.  (Doc. 272 at 25.)  GSCO is correct that, "[i]n general, a party's failure to raise an affirmative defense in the pleadings results in a waiver of the defense," *Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1350 (11th Cir. 2007) (citing *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1077 (11th Cir. 2003)), but an exception applies when the defense is tried to the jury "by the parties' express or implied consent," *see* Fed. R. Civ. P. 15(b)(2) (stating

notes that the jury received instructions regarding Defendants' justification defense but rejected it by finding for GSCO on its tortious inteference claims.  (*See* Doc. 272 at 25 n.12; Doc. 234 at 45-46; Doc. 235 at Questions IV.A.1-2.)   GSCO adds that it presented "substantial evidence of the wrongful means employed by Defendants in their interference with [GSCO]" to support that determination, including, *inter alia*, Defendants' "constant infringement of [GSCO's] marks and copyrights." (*Id.* at 26.)  The court agrees.  Simply put, GSCO is correct that the evidence supporting its trademark and copyright claims, discussed in detail above, *see supra* Parts II.D.2.a.(1)-(2), likewise constitutes substantial evidence that Defendants' actions involved "wrongful means," *Tom's Foods, Inc.*, 896 So. 2d at 458-59. For that reason, Defendants' "competitor's privilege" defense is unavailing.  The court therefore finds that the jury's verdict is not against the great weight of the evidence as to GSCO's tortious interference claims.  And, as a result, Defendants' Rule 59 motion for a new trial on the ground that the verdict is contrary to the clear weight of the evidence is due to be denied.

b.      *Excessive Damages*

For Defendants' second ground for a new trial, Defendants argue that the jury's award with regard to GSCO's trademark and unfair competition claims is excessive.  (Doc. 261 at

---

that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings").  The exception applies here, as GSCO did not object to Defendants' admission of evidence probative of the defense during trial, nor did it object to the inclusion of the defense in the jury instructions.  (*See* Doc. 234 at 45-46.)

8-16.)  Citing the damages provision of the Lanham Act,[53] Defendants argue that "[t]he jury's verdict of $1 million against ISHA and FNAWS is plainly excessive and constitutes a penalty when considered in light of the principles of equity."  (*Id.* at 8.)  They insist that the award "demonstrates that the jury was misled or confused to the prejudice of Defendants, entitling Defendants to a new trial," or alternatively a new trial on damages.[54]  (*Id.*)

Defendants are indeed correct that "when a court finds that a jury's award of damages is excessive, it may grant the defendant a new trial," or instead a new trial on damages. *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1328 & n.6 (11th Cir. 1999) (citing *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996)) (citation omitted).  But, the Eleventh Circuit has clarified that "a new trial should be ordered only where the verdict is so excessive as to shock the conscience of the court."  *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1447 (11th Cir. 1985) (citing *Thompson v. Nat'l R.R. Passenger Corp.*, 621 F.2d 814, 827 (6th Cir. 1980)).  That is not this case.

Primarily, as the court has already discussed, *see supra* Part II.D.2.a.(1).(d), Mr. DeBoer gave testimony that GSCO sustained actual damages of almost $4 million due to

---

[53] As stated above in greater detail, *see supra* Part II.D.2.a.(1).(d), "damages for trademark infringement may include (1) the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1564 (11th Cir. 1986) (citing 15 U.S.C. § 1117).

[54] Defendants also maintain that "the compensatory awards of $400,000 for tortious interference and $100,000 for breach of contract are excessive," arguing that "[s]uch awards were based upon the very same evidence as was offered in support of GSCO's trademark damages and are plagued by the same deficiencies."  (Doc. 261 at 15-16.)

Defendants' infringement, and also suffered incalculable damage to its reputation. (*See* Doc. 317 at 45:9-46:2, 56:19-57:23.) It is likely the court would find that the jury's award is not excessive based on that evidence alone. That determination is unnecessary, however, because GSCO also presented evidence of Defendants' profits, specifically their "convention revenues for the fiscal years ending in 2005-2007," which constitutes an additional basis for damages under trademark law. (Doc. 273 at 10; Pl.'s Trial Exs. 621 & 643.) Indeed, because the jury did not apportion its award between GSCO's actual damages and Defendants' profits, it is impossible to determine what amount of the $1 million award, if any, represents GSCO's actual damages and what amount represents Defendants' profits. (*See* Doc. 235 at Question I.4; Doc. 261 at 13; Doc. 273 at 12 n.9.)

Still, Defendants object to an accounting for profits, arguing that "[t]he evidence adduced at trial does not support [it]." (Doc. 261 at 9.) According to the Eleventh Circuit, "an accounting of a defendant's profits is appropriate where: (1) the defendant's conduct was willful and deliberate, (2) the defendant was unjustly enriched, or (3) it is necessary to deter future conduct." *Optimum Techs., Inc. v. Home Depot U.S.A., Inc.*, 217 F. App'x 899, 902 (11th Cir. 2007) (citing *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1521 (11th Cir. 1990)). Under the first factor, the Eleventh Circuit clarified that "willful and deliberate" conduct occurs "where the infringer was 'knowingly and deliberately cashing in upon the good will of [the infringed].'" *Id.* at 903 (quoting *Burger King v. Mason*, 855 F.2d 779, 781 (11th Cir. 1988)).

71

Here, the parties dispute whether the jury could have found willful infringement based on the evidence.  (Doc. 261 at 10, Doc. 273 at 10.)  As expected, Defendants assert that they "have not engaged in 'willful' infringement" and argue that "[n]o evidence was adduced at trial that Defendants intended to trade upon any goodwill of GSCO or passed their goods and services off as GSCO's."  (Doc. 261 at 10.)  Instead, Defendants maintain that "prior to the dates that GSCO sought to register its trademarks, Defendants did not have knowledge that GSCO claimed exclusive rights in such marks."[55]  (*Id.*)  And while Defendants concede that they continued using the marks after learning of GSCO's claims, they maintain they did so "with a good faith belief that GSCO's claimed marks are invalid."  (*Id.*)  On the other hand, GSCO insists that it is "beyond legitimate dispute" whether the jury found willfulness, noting that the jury determined that Defendants "consciously or deliberately engage[d] in oppression, fraud, wantonness, or malice" with respect to its tortious interference claims, and awarded GSCO $400,000 in punitive damages.  (Doc. 273 at 10, Doc. 235 at Questions IV.A.3-4.)  As GSCO points out, its tortious interference claims were "in part based on Defendants' infringement."  (Doc. 273 at 10.)  What's more, GSCO also argues that it presented "abundant evidence" of Defendants' willful infringement at trial.  (*Id.*)  The court agrees.

---

[55] GSCO filed its trademark registration applications for its GRAND SLAM, GRAND SLAM OF NORTH AMERICAN WILD SHEEP, OVIS WORLD SLAM, and CAPRA WORLD SLAM on August 4, 2004.  (Pl.'s Trial Exs. 1, 2, 3, 4, & 5.)

Particularly, GSCO presented evidence that shortly after GSCO's non-renewal of the 1995 Agreement in February of 2004, FNAWS began infringing GSCO's marks through its "Wild Sheep" magazine and by promoting its convention with infringing terms. (*Id.*; Doc. 311 at 177:8-182:24; Pl.'s Trial Ex. 515.) For example, Mr. Campbell testified that approximately four months after GSCO's non-renewal of the agreement, FNAWS published an article entitled "FNAWS IS THE GRAND SLAM," written by one of the members of FNAWS' Board of Directors, Don Peay. (Doc. 311 at 180:20-182:16; Pl.'s Trial Ex. 515.) In response, on September 23, 2004, GSCO sent FNAWS a letter notifying FNAWS of GSCO's claimed intellectual property rights and pending trademark registrations; the letter also informed FNAWS of its infringement of GSCO's marks and proposed that FNAWS cease and desist using the marks until the organizations could reach an agreement. (Doc. 311 at 189:7-24, Pl.'s Trial Ex. 240.) As a result, the parties entered into the 2005 Agreement, which stated in part that "GSCO and FNAWS agree . . . to request permission to the use of one another's Intellectual Property." (Pl.'s Trial Ex. 41.) GSCO presented evidence through the testimony of Hugh Jacks that the inclusion of this particular clause in the 2005 Agreement was a "show stopper" for GSCO. (Doc. 316 at 161:7-15.) Mr. Jacks added that Ron Pomeroy, who negotiated the agreement on behalf of FNAWS, asked him specifically what "Intellectual Property" GSCO was referencing, and that he responded that GSCO claimed the marks: "3/4 Slam, Grand Slam of North American Wild Sheep; Grand Slam;

Grand Slam Club . . . Ovis World Slam; CAPRA World Slam; Triple Slam."[56]  (*Id.* at 162:2-25.)

Mr. Campbell testified that "FNAWS did not live up to the provisions of [the 2005 Agreement]," demonstrated by its Fall 2005 and Winter 2005-2006 issues of "Wild Sheep," and by an advertising flyer promoting its 2007 convention, which Mr. Campbell noted was sent out in early fall of 2006.  (Doc. 311 at 205:16-208:3, Doc. 315 at 9:23-13:25, 15:6-16:21; Pl.'s Trial Exs. 523, 524, 45 & 45-A.)  GSCO therefore sent a second cease and desist letter, dated October 5, 2006.  (Doc. 315 at 16:25-20:8; Pl.'s Trial Ex. 47.)  According to Mr. Campbell, Defendants' infringement not only continued despite the second letter, evidenced by the Fall 2006 issue of "Wild Sheep," but had escalated in that Defendants published their ISHA Super SLAM and ISHA Capra SLAM forms in the issue as well, which GSCO argues infringed not only its copyrighted forms, but also, for example, its CAPRA WORLD SLAM service mark.  (Doc. 315 at 20:17-23:15, 24:21-37:3; Pl.'s Trial Ex. 528; *see* Doc. 273 at 10-11 & n.8.)  Following the continued infringement, GSCO filed suit.  (Doc. 273 at 10 n.8; Doc. 1.)

The court is of the opinion that Defendants' continuing infringement of GSCO's marks after receiving two cease and desist letters, as well as their breach of the 2005

---

[56] It is also relevant that during Mr. Pomeroy's testimony, when Defendants questioned Mr. Pomeroy as to the 2005 Agreement on direct examination, Defendants did not ask that he clarify what "Intellectual Property" GSCO was referencing in the clause.  (*See* Doc. 318 at 216:25-222:3; Pl.'s Trial Ex. 41.)  Nor did Mr. Pomeroy specify the "Intellectual Property" that each side claimed during cross-examination, although he did admit that GSCO's claimed intellectual property included the Grand Slam of North American Wild Sheep mark.  (Doc. 319 at 31:16-32:12.)

Agreement, constitutes substantial evidence that their conduct was willful and deliberate. (*See* Doc. 235 at Questions I.2, III. A.1-2; Pl.'s Trial Exs. 47 & 240.)   And, despite Defendants' argument that they used the marks "with a good faith belief that GSCO's claimed marks are invalid," the jury found otherwise. (*See* Doc. 235 at Question I.1, IV.A.3-4; Doc. 261 at 10.)  Thus, in addition to the almost $4 million in actual damages, the court finds that the jury could have also awarded GSCO that portion of Defendants' convention profits, which totaled $8,549,262, which the jury found attributable to Defendants' infringement. (*See* Doc. 234 at 35-36; Doc. 273 at 10; Pl.'s Trial Exs. 621 & 643.)  For that reason, the jury's $1 million award amounts to only a small percentage of the up to $12.5 million requested by GSCO, and further indicates that the jury did not blindly accept GSCO's assessment.   Therefore, the court is of the opinion that the jury's award on GSCO's trademark and unfair competition claims is not excessive.  Additionally, the court is also of the opinion that the jury's award of $400,000 on GSCO's tortious interference claims is not excessive, as Defendants' infringement of GSCO's marks constitutes one of several evidentiary bases for the claims.  *See supra* Part II.C.2.c.  Finally, because the court's judgment did not include the jury's $100,000 award regarding GSCO's breach of contract claim, the court finds Defendants' argument that the award is excessive on that ground to be moot.  (*See* Doc. 242.)  Defendants' Rule 59 motion for a new trial on the ground that the jury's award is excessive, or alternatively for a new trial on damages, is due to be denied.

c.       *The Admission of Evidence on Damages*

As to Defendants' third ground for a new trial, they maintain that "[t]he only evidence adduced on the subject of money damages was testimony by Taylor DeBoer," which Defendants again insist was incompetent, wholly speculative, and improperly admitted. (Doc. 261 at 16-18.)  The court has already addressed this argument, however, and rejected it.  *See supra* Parts II.C.2.c, II.D.2.a.(1).(d).  Defendants' Rule 59 motion for a new trial on the ground that the court improperly admitted Mr. DeBoer's testimony is therefore due to be denied.

d.       *The Jury Instructions*

Next, regarding their fourth ground for a new trial, Defendants argue that the jury instructions were erroneous and incomplete, resulting in prejudice to Defendants, and warranting a new trial.  (Doc. 261 at 18-25.)  Defendants concede that they failed to raise objections to the jury instructions when Judge Hopkins provided them to the parties at the final jury charge conference, which generally results in a waiver of any objections to the instructions under Fed. R. Civ. P. 51.[57]  (*See id.* at 18.)  *See also Pate v. Seaboard R.R., Inc.*, 819 F.2d 1074, 1082 (11th Cir. 1987) ("The purpose of Rule 51 is to 'prevent unnecessary new trials because of errors the judge might have corrected if they had been brought to his

_____

[57] Rule 51(c)(2) states in pertinent part that "[a]n objection is timely if . . . a party objects at the opportunity provided by Rule 51(b)(2)," i.e. when "[t]he court . . . give[s] the parties an opportunity to object on the record and out of the jury's hearing before the instructions and arguments are delivered." Fed. R. Civ. P. 51(b)(2), (c)(2).

attention at the proper time.'" (quoting *Indep. Dev. Bd. of Section, Ala. v. Fuqua Indus., Inc.*, 523 F.2d 1226, 1238 (5th Cir. 1975))).  Nevertheless, Defendants contend that the Eleventh Circuit's opinion in *Pate v. Seaboard Railroad, Inc.* recognizes two exceptions to that general rule.  (Doc. 261 at 18-19.)  Indeed, *Pate* offers "two narrow exceptions where a new trial will still be granted despite a party's failure adequately to object to the erroneous jury charge."  *Pate*, 819 F.2d at 1082-83.  The first exception is "where 'the party's position has previously been made clear to the court and it is plain that a further objection would have been unavailing.'"  *Id.* at 1082 (quoting *Lang v. Texas & Pacific R.R. Co.*, 624 F.2d. 1275, 1279 (5th Cir. 1980)).

Here, pursuant to the first exception, Defendants contend that their instructions "regarding the potential invalidity of registered trademarks and regarding the 'substantial similarity' test in copyright law were due to be given."  (Doc. 261 at 19.)  In support, they cite their Proposed Jury Instructions, and argue they "believe that they made their position clear to the court" in two earlier jury charge conferences, but note that, without a transcript, they are "uncertain what objections they raised or arguments they made."  (*Id.*; Doc. 261, Ex. A at 17-18, 53-54.)  That said, the court is unconvinced that Defendants' "'position [was] previously . . . made clear to the court and it is plain that a further objection would have been unavailing.'"  *See Pate*, 819 F.3d at 1082 (quoting *Lang*, 624 F.2d at 1279).  First, Defendants themselves are unclear what objections they made at the earlier jury charge conferences.  (Doc. 261 at 19.)  Second, as GSCO points out, the trial record reveals that

77

Judge Hopkins, at the final charge conference, gave both parties repeated opportunities to object to the instructions; Defendants made no objections, but instead expressly approved of the jury instructions.  (*See, e.g.*, Doc. 308 at 78:19-24, 146:8-22; Doc. 314 at 15.)  Finally, Defendants' Proposed Jury Instructions, without more, fail to establish the first exception. *Electro Servs., Inc. v. Exide Corp.*, 847 F.2d 1524, 1528-29 (11th Cir. 1988) (holding that "the offering of a proposed instruction does not preserve a challenge to the court's instructions under Rule 51, absent a specific objection" (quoting *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1515 (10th Cir. 1984), *aff'd on other grounds*, 472 U.S. 585 (1985))).  Therefore, the court finds that the first exception does not apply.

The second exception recognized by *Pate* applies "where the error is 'so fundamental as to result in a miscarriage of justice,'" i.e. the "plain error" doctrine.  *Pate*, 819 F.2d at 1082-83 (quoting *Iervolino v. Delta Air Lines, Inc.*, 796 F.2d 1408, 1414 (11th Cir. 1986)).  To demonstrate plain error, a party "must establish that the challenged instruction was an incorrect statement of the law and that it was probably responsible for an incorrect verdict, leading to substantial injustice."  *Id.* at 1083 (citing *Rodrigue v. Dixilyn Corp.*, 620 F.2d 537, 541 (5th Cir. 1980)); *see also Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1018 (11th Cir. 2004) (stating that "[p]lain error review is very stringent and reversal for incorrect jury instructions will occur only in exceptional cases") (citing *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1329 (11th Cir. 1999)).

Under the second exception, Defendants first contend that plain error occurred because "[t]he jury should have been instructed that Defendants could meet their burden to prove the invalidity of GSCO's registered marks by proving by a preponderance of the evidence that such marks are generic or descriptive and lacking secondary meaning." (Doc. 261 at 20.) But, as GSCO argues and Defendants recognize, the jury instructions indeed specified that "[t]he defendants have the burden of proving that GSCO's registered marks lack secondary meaning." (*Id.* at 22 n.3; Doc. 273 at 20-21; Doc. 234 at 26.) However, Defendants claim that because the jury instructions included this charge in the section following a section devoted to unregistered marks, that the "statement would not . . . lead the jury through the appropriate analysis of the validity of the registered marks." (Doc. 261 at 22 n.3.) The court finds that such speculation, without more, falls short of establishing plain error, especially considering the court included with the instructions a "Table of Contents," which clearly separated each section. (*See* Doc. 234 at Table of Contents.) Also, that the jury instructions did not specifically include an isolated statement informing the jury that GSCO's registered marks were invalid if generic, does not satisfy plain error. The court finds that the lack of such instruction was not "probably responsible for an incorrect verdict." *Pate*, 819 F.3d at 1082.

Finally, Defendants argue that plain error occurred because the jury instructions did not include additional instructions for applying copyright law's "substantial similarity" test for determining whether "there are substantial similarities between the defendants' works and

79

[GSCO's] copyrighted works."  (*See* Doc. 261 at 23-25; Doc. 234 at 37-38.)  Defendants'

argument does not allege "an incorrect statement of the law," but only that additional

instructions would have been helpful to the jury.  (*See* Doc. 261 at 23-25.)  After reviewing

the actual jury instructions on copyright law and infringement, however, the court finds that

the instructions, taken as a whole, adequately covered the charge requested by Defendants,

specifically their proposed instruction labeled "Substantial Similarity Test -- Compilation."

(*Compare* Doc. 261, Ex. A at 53-54, *with* Doc. 234 at 36-41.)  The court is therefore of the

opinion that the lack of Defendants' specific charge was not "probably responsible for an

incorrect verdict."  *Pate*, 819 F.3d at 1082.  Thus, Defendants have failed to establish plain

error.  Defendants' Rule 59 motion for a new trial on the ground that the jury instructions

were erroneous and incomplete is therefore due to be denied.


e.    *The Jury's Verdict*

For Defendants' final ground for a new trial, they argue that the jury's special verdict

form, particularly the jury's response to Question I.3, demonstrates that the jury failed to

understand and follow the jury instructions, and that "[t]he only remedy under the

circumstances is a new trial."  (Doc. 261 at 25-28.)  Question I.3 asked the jury to "list the

terms or marks which you find constituted infringement or unfair competition when used by

either or both Defendants."  (Doc. 235 at Question I.3.)  During deliberations, the jury

submitted a question concerning Question I.3, asking whether it "need[ed] to list specific

instances (dates, times, publications) to where each infringement or unfair competition occurred." (Doc. 236.) Judge Hopkins and the parties agreed to answer "no." (Doc. 308 at 147:24-148:1, 17-23.) Still, the jury answered the question unexpectedly by listing as their response: "Magazines, Registration Applications, Acknowledgement [sic] of 3/4 Slams 3/4 Raffles, News, Website, Catalogs." (Doc. 235 at Question I.3.)

Particularly, Defendants maintain that the jury's answer to Question I.3 indicates the jury "failed to understand the most fundamental concept of trademark law: what a mark is," and also "failed to understand the very simple English word, term." (Doc. 261 at 25.) So, Defendants contend "it must be concluded that the jury [either] did not read and follow the instructions carefully," or instead mistakenly considered their answer to constitute "terms and marks." (*Id.* at 25-26.) Either way, Defendants argue the jury's error prejudiced them, requiring a new trial pursuant to *Kosmynka v. Polaris Industries, Inc.*, 462 F.3d 74, 86-87 (2d Cir. 2006) (holding new trial necessary where jury returned inconsistent verdict because jury's verdict on one claim necessarily negated its finding on another claim), and *J.A. Jones Construction Co. v. Steel Erectors, Inc.*, 901 F.2d 943, 944 (11th Cir. 1990) (holding new trial necessary where district court found, *inter alia*, that jury disregarded court's instructions). (Doc. 261 at 27.)

GSCO does not dispute that an inconsistent jury verdict may require a new trial, but instead claims Defendants waived the argument, and, if not, that the verdict is not inconsistent, but "instead merely irrelevant." (Doc. 273 at 18-20, 21-22.) The court agrees

with the latter.  Indeed, the Eleventh Circuit requires that a court "attempt to reconcile a jury's apparently inconsistent answers to special interrogatories."  *Royal Cup Inc. v. Jenkins Coffee Serv. Inc.*, 898 F.2d 1514, 1519 (11th Cir. 1990) (citing *Gallick v. Baltimore & O.R.R.*, 372 U.S. 108, 119 (1963)).  "The test for resolving apparent inconsistencies 'is whether the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted.'"  *Id.* (quoting *Griffin v. Matherne*, 471 F.2d 911, 915 (5th Cir. 1973)).  And, "'[w]here there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.'"  *Technical Res. Servs., Inc. v. Dornier Med. Sys., Inc.*, 134 F.3d 1458, 1464 (11th Cir. 1998) (quoting *Gallick*, 372 U.S. at 119).  Here, as GSCO notes, a comparison of the jury's response to Question I.3 with the question itself, especially considering the question submitted to the court by the jury concerning Question I.3, reveals that the jury merely specified what evidence it relied upon in finding infringement rather than listing what terms constituted infringement.  (*See* Doc. 235 at Question I.3; Doc. 236; Doc. 273 at 21-22.)  The court finds that the jury's answer to Question I.3 is therefore not inconsistent with its other answers.  As a result, Defendants' Rule 59 motion for a new trial on the ground that the jury failed to follow and understand the jury instructions is due to be denied.

f.   *Defendants' Alternative Motion to Alter or Amend the Judgment*

In the alternative to their request for a new trial, Defendants request that the court alter or amend the judgment pursuant to Fed. R. Civ. P. 59(e) to excise the damages awarded to GSCO on its tortious interference claims and also the statutory damages for its copyright claims.[58]  (Doc. 261 at 28-31.)  As stated by the Eleventh Circuit, "'[t]he only grounds for granting [a Rule 59(e)] motion are newly-discovered evidence or manifest errors of law or fact.'"  *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (quoting *In re Kellogg*, 197 F.3d 1116, 1119 (11th Cir. 1999)).  That said, "'[a] Rule 59(e) motion [cannot be used] to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment.'"  *Id.* (quoting *Michael Linet, Inc. v. Village of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005)).  And, "[t]he denial of a Rule 59 motion raising new arguments is 'especially soundly exercised when the party has failed to articulate any reason for the failure to raise [an] issue at an earlier stage in the litigation.'"  *Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 855-56 (11th Cir. 2006) (quoting *O'Neal v. Kennamer*, 958 F.2d 1044, 1047 (11th Cir. 1992)).

Regarding Defendants' first request under Rule 59(e), Defendants insist that the court should alter or amend the judgment because "the amount awarded by the jury in compensatory damages for tortious interference . . . constitutes a prohibited double recovery that must be excised."  (Doc. 261 at 29.)  The court has already addressed this argument,

---

[58] Rule 59(e) states only that "[a] motion to alter or amend a judgment must be filed no later than 10 days after the entry of judgment."  Fed. R. Civ. P. 59(e).

however, and rejected it.  *See supra* Part II.D.2.a.(3).  The court finds that Defendants' first request is without merit.

As to Defendants' second request, Defendants argue that the court "must also alter or amend the judgment to excise the $100,000 award to GSCO of statutory damages for copyright infringement." (Doc. 261 at 30.)  Defendants point to section 412 of the Copyright Act in support, which states in pertinent part that "no award of statutory damages . . . shall be made for . . . any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.  17 U.S.C. § 412 (2009).  Stated differently, unless the three-month provision of section 412 applies,[59] a "copyright owner must have registered the copyright prior to the infringement in order to obtain statutory damages." *Cable/Home Commc'ns Corp. v. Network Prods., Inc.*, 902 F.2d 829, 850 (11th Cir. 1990) (citing § 412).

Here, Defendants maintain that when GSCO filed suit on November 9, 2006, "it had registered only one of its two copyrights," specifically its OVIS World Slam form, registered on October 30, 2006.[60]  (*See* Doc. 261 at 30; Doc. 1; Pl.'s Trial Ex. 8 & 13.)  Defendants assert that "[a]t trial, GSCO offered no evidence as to the chronology of Defendants' alleged

---

[59] The three-month provision does not apply to GSCO's OVIS World Slam and CAPRA World Slam forms.  (*See* Pl.'s Trial Exs. 8, 9, 13 & 14.)

[60] GSCO registered its CAPRA World Slam form on December 11, 2006.  (*See* Pl.'s Trial Ex. 8.)

copyright infringement [and] certainly did not prove that Defendants' infringement commenced *after* it obtained its registrations." (Doc. 261 at 30-31.) For that reason, Defendants argue that "the award of statutory damages cannot stand." (*Id.* at 31.) GSCO responds by pointing out that "it was Defendants – and not [GSCO] – who presented a proposed instruction on statutory damages," which "appeared under the heading '[Alternative Instruction if Statutory Damages Elected by GSCO].'" (Doc. 273 at 23-24.) Thus, GSCO argues that "this is a classic case of invited error." (*Id.* at 24.) Defendants offered no response to GSCO's argument in their reply brief. (*See* Doc. 279.)

GSCO is correct that Defendants initially proposed the instruction, albeit labeled it an "Alternative" instruction. (*See* Doc. 273 at 23 & n.14, Ex. 2 at 56.) Moreover, during the jury charge conference, Defendants did not remain silent when the court discussed the instructions regarding GSCO's copyright claims, but instead actively contributed. (*See* Doc. 320 at 147:24-150:11, 192:7-193:10, 204:20-205:2, 211:11-216:21.) In fact, at one point during the conference, the parties and Judge Hopkins discussed the merit of including a special interrogatory related to statutory damages, which would have required that the jury specify whether Defendants' copyright infringement occurred after the date GSCO registered its copyrights. (*See id.* at 211:11-214:1.) The final verdict form did not include that interrogatory, however, nor did the jury instructions discuss the relevance of the registration date. (*See* Doc. 234 at 36-41, Doc. 235.) Despite the omission, Defendants did not object when the court initially discussed the final verdict form and the accompanying instructions

related to GSCO's copyright claims, following the parties' closing arguments.  (Doc. 308 at

73:21-74:2, 76:12-14, 78:20-23.)  Instead, Defendants stated they had no objections.  (*Id.*)

Nor did Defendants object after the court read the instructions to the jury, although Judge

Hopkins gave the parties an additional opportunity to do so.  (*See id.* at 143:13-16.)  And,

after the jury returned its verdict, Defendants again did not raise the issue of whether

infringement occurred after the copyrights' registration dates, but rather agreed to file a post-

verdict brief discussing all of the unresolved issues, which the court would consider prior to

entering judgment.  (*See id.* at 155:22-165:2; Doc. 235 at Question II.2.)  In that post-verdict

brief, although untimely filed, Defendants did not object to or even mention the jury's

statutory damages award on GSCO's copyright claims.  (*See* Doc. 240.)  Simply put,

Defendants had ample opportunity to raise the statutory damages issue prior to the court

entering judgment on the jury's verdict, but failed to do so.  Defendants have further offered

no reason for their failure to raise the issue.  (*See* Doc. 261 at 28-31; Doc. 279.)  The court

therefore finds that Defendants have waived the objection.  *See Arthur*, 500 F.3d at 1343

(quoting *Michael Linet, Inc.*, 408 F.3d at 763).  The court is of the opinion that Defendants'

request that the court alter or amend the judgment to excise the compensatory damages on

GSCO's tortious interference claims and the statutory damages on its copyright claims is due

to be denied.

g.    *Defendants' Alternative Motion to Alter or Amend the Permanent Injunction*

Also in the alternative to their request for a new trial, Defendants ask that the court

alter or amend the permanent injunction under Rule 59(e).  (*See* Doc. 261 at 3, 31-33.)

Defendants argue that the current injunction "is insufficiently specific and unduly broad,"

and for support essentially repeat the arguments made in their motion pursuant to Fed. R.

Civ. P. 60(b).  (*See id.*; Doc. 250 at 12-14.)   For the same reasons the court rejected

Defendants' arguments under their Rule 60(b) motion, the court likewise rejects them here

under Defendants' Rule 59(e) motion.  *See supra* Part II.A.2 (discussing Defendants' Rule

60(b) motion).  The court is of the opinion that Defendants' arguments challenging the

injunction simply do not demonstrate "a manifest error of law or fact," and for that reason

Defendants' request that the court alter or amend the permanent injunction is due to be

denied.  *See Arthur*, 500 F.3d at 1343 (quoting *In re Kellogg*, 197 F.3d at 1119).


h.    *Defendants' Alternative Motion for a Remittitur of Damages*

In the further alternative to Defendants' motion for a new trial, Defendants request

that the court remit the compensatory and punitive damages awarded by the jury.  (Doc. 261

at 33-35.)  Specifically, Defendants contend that the court "should remit the compensatory

damages to a nominal amount or grant a new trial solely as to damages," and also insist that

"[t]he award of $400,000 in punitive damages against Defendants for tortious interference

violates Defendants' constitutional rights." (*Id.* at 33-34.)  The court has already determined

that the jury's award of compensatory damages is not excessive, however, and therefore finds Defendants' initial request for a remittitur of those damages to be unavailing.  *See supra* Part II.D.2.b.

Defendants' second argument, that the jury's award of $400,000 in punitive damages for Defendants' tortious interference is unconstitutionally excessive and must be remitted, (Doc. 261 at 33-35), implicates the three constitutional guideposts set out by the Supreme Court of the United States for reviewing punitive damage awards, as well as the related factors established by the Alabama Supreme Court.  *See Am. Employers Ins. Co. v. S. Seeding Servs., Inc.*, 931 F.2d 1453, 1458 (11th Cir. 1991) (citing *Browning-Ferris Indus., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257 (1989)) (noting that district courts should review a jury's award of punitive damages on state law claims pursuant to both state law, to determine whether the award is excessive, and federal law, to determine whether a new trial or remittitur is necessary under Rule 59).

The Supreme Court's guideposts for determining whether an award of punitive damages is "grossly excessive," thereby requiring a new trial or a remittitur of damages, include: (1) "the degree of reprehensibility of the defendant's conduct," (2) the "ratio [between the punitive damages award] to the actual harm inflicted on the plaintiff," and (3) the difference between "the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct."  *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-84 (1996).  The court will address each guidepost in turn.

As to the first *Gore* guidepost, which remains "[p]erhaps the most important indicium of the reasonableness of a punitive damages award," *id.* at 575, the Court has clarified that in determining the reprehensibility of a defendant's conduct, a court should consider whether: "the harm caused was physical as opposed to economic; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (citing *Gore*, 517 U.S. at 576-77). The Court added that "[t]he existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.*

In the instant case, Defendants maintain that their conduct was not reprehensible, and note primarily that "[e]conomic torts are, by their nature, less worthy of large punitive damages awards than torts inflicting injuries to health and safety." (Doc. 261 at 34.) In contrast, GSCO insists that "[t]he record is replete with evidence demonstrating the reprehensibility of Defendants' conduct," and assert that "[Defendants] repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful." (Doc. 273 at 28-29.) GSCO alleges further that the harm Defendants inflicted "'was the result of intentional malice' towards [GSCO]." (*Id.* at 29 (quoting *Campbell*, 538 U.S. at 419).) Reviewing the competing considerations, the court finds particularly relevant that Defendants continued to infringe GSCO's marks on multiple occasions despite receiving two cease and desist letters.

89

(*See* Doc. 235 at Question I.2, Pl.'s Trial Exs. 47 & 240.)  FNAWS also breached the 2005

Agreement, which the parties had originally entered into following the first cease and desist

letter in part to avoid court intervention.  (*See* Doc. 235 at Questions III.A.1-2; Pl.'s Trial Ex.

41.)  Thus, GSCO is correct that Defendants' infringement involved repeated and intentional

conduct despite notice that it might be unlawful.  (*See* Doc. 273 at 28-29.)  And, although

Defendants are correct that the harm was economic in nature, (Doc. 261 at 34), as the Court

stated in *Gore*, even the "infliction of an economic injury, especially when done intentionally

through affirmative acts of misconduct . . . can warrant a substantial penalty, *Gore*, 517 U.S.

at 576 (internal citation omitted).  Therefore, the court is of the opinion that the first *Gore*

guidepost weighs in favor of upholding the jury's award.

Under the second guidepost in *Gore*, which considers the ratio between punitive

damages and the actual harm inflicted on the plaintiff, while the Court has refused "to impose

a bright-line ratio which a punitive damages award cannot exceed," it has specified that

"[s]ingle-digit multipliers are more likely to comport with due process, while still achieving

the State's goals of deterrence and retribution." *Campbell*, 538 U.S. at 425 (citing *Gore*, 517

U.S. at 582).  For example, the Court has upheld punitive damage awards that are four times

and ten times greater than the actual or potential damages caused by the defendant, but has

held awards with ratios of 145 to 1 and 500 to 1 to be unconstitutionally excessive.  *Compare*

*id.* at 425, 429 (reversing punitive damage award with ratio of 145 to 1), *and Gore*, 517 U.S.

at 582, 586 (reversing award with ratio of 500 to 1), *with TXO Prod. Corp. v. Alliance Res.*

*Corp.*, 509 U.S. 443, 446, 462, 466 (1993) (upholding award with ratio of 10 to 1), *and Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23-24 (1991) (upholding award with ratio of 4 to 1).

Here, as GSCO points out, the jury awarded GSCO $400,000 in compensatory damages on its tortious interference claims and $400,000 in punitive damages.  (Doc. 273 at 29; Doc. 235 at Questions IV.A.1-4.)  *See also supra* Part II.C.2.c (discussing the damages GSCO sustained from Defendants' tortious interference).  The ratio, 1 to 1, is well within the limits proposed by the Court.  As a result, the court finds that the second guidepost in *Gore* weighs in favor of upholding the jury's verdict.

And lastly, regarding the third *Gore* guidepost, which makes relevant any comparable civil or criminal penalties, the Court has cautioned that while "[t]he existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action . . . [w]hen used to determine the dollar amount of the award, however, the criminal penalty has less utility."  *Campbell*, 538 U.S. at 428.  The reason for the caution is that, in part, "criminal penalties . . . can be imposed only after the heightened protections of a criminal trial have been observed."  *Id.*

Defendants argue that "the analogous criminal or civil penalty for the sort of tortious interference alleged by GSCO in this case is not more than $2,000 per violation, which is set forth by Ala. Code § 8-19-11 for violations of Alabama's Deceptive Trade Practices Act."  (Doc. 261 at 35.)  The statute states in pertinent part that "[a]ny person who is knowingly engaging in or has knowingly engaged in any act or practice declared unlawful by Section

8-19-5 shall forfeit or pay a civil penalty of not more than $2,000 per violation." Ala. Code § 8-19-11 (b) (1975). The corresponding section referenced by section 8-19-11 lists the "deceptive acts or practices in the conduct of any trade or commerce [that are] unlawful," which includes "[c]ausing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services." Ala. Code § 8-19-5. GSCO has offered no response to Defendants' argument in their brief in opposition, nor does GSCO even address the third *Gore* guidepost. (*See* Doc. 273 at 28-29.) Although of "less utility" in deciding this issue, *see Campbell*, 538 U.S. at 428, the court finds that the third guidepost weighs against upholding the jury's verdict. That said, balancing the three guideposts, the court nevertheless finds that the third *Gore* guidepost does not outweigh the other two. So, the court is of the opinion that the jury's punitive damage award of $400,000 on GSCO's tortious interference claim is not unconstitutionally excessive under the Court's guideposts.

The court likewise finds that the punitive damage award is not excessive under the relevant factors established by the Alabama Supreme Court. *See Green Oil Co. v. Hornsby*, 539 So. 2d 218, 223-24 (Ala. 1989) (listing seven factors to "be taken into consideration by the trial court in determining whether the jury award of punitive damages is excessive or inadequate" (citing *Aetna Life Ins. Co. v. Lavoie*, 505 So. 2d 1050, 1062 (Ala. 1987) (Houston, J., concurring specially))); *see also Hammond v. City of Gadsden*, 493 So. 2d 1374, 1378-79 (Ala. 1986) (listing non-exclusive factors for determining whether a jury verdict is "excessive or inadequate as a matter of law, or where . . . the verdict is based upon

92

bias, passion, corruption, or other improper motive").  Primarily, as GSCO points out,
"[m]any of the *Hammond/Green Oil* factors applied by Alabama courts overlap with the
constitutional guideposts [set out in *Gore*]."  (Doc. 273 at 29.)  For example, the "degree of
reprehensibility" or "culpability" of the defendant's conduct is always a factor to be
considered, as is the relationship between the punitive damage award and the actual or likely
harm imposed by the defendant's actions.  *See Gore*, 517 U.S. at 575, *Green Oil Co.*, 539 So.
2d at 223; *Hammond*, 493 So. 2d at 1379.  Therefore, the court is of the opinion that
Defendants' request for a remittitur of the $400,000 punitive damage award for their tortious
interference is due to be denied.

i.    *Defendants' Alternative Motion for a Rehearing on their Equitable Defenses and
      Cancellation Counterclaim*

For Defendants' final request under Fed. R. Civ. P. 59, Defendants move under Rule
59(a)(2) "for a rehearing of the issues tried to the bench," i.e. their equitable affirmative
defenses, including abandonment, acquiescence, laches, and unclean hands, and their
counterclaim for cancellation of GSCO's registered marks.  (Doc. 261 at 1-2.)  Defendants
argue that "[t]he facts that support Defendants' equitable defenses . . . . and [their]
counterclaim for cancellation are inextricable from those underlying the other issues in this
case."  (*Id.* at 2.)  Thus, Defendants assert that "[t]o retry the case to the jury without a
rehearing of the matters tried to the bench would prejudice all parties."  (*Id.*)  The court has
herein rejected all of Defendants' arguments for a new trial, however, and therefore finds

Defendants' request for a rehearing on their equitable defenses and cancellation counterclaim to be unavailing.  Their motion for a rehearing on those issues is due to be denied.

## E.    DEFENDANTS' MOTION TO STRIKE (DOC. 280)

Pursuant to Fed. R. Civ. P. 12(f), Defendants moved the court "to strike the words 'theft' and 'stole' and any similar terms from [GSCO's] post-judgment briefs," insisting that the terms are "impertinent and scandalous."  (Doc. 280 at 1.)  GSCO filed a brief in opposition.  (Doc. 282.)

Rule 12(f) states in pertinent part that "[t]he court may strike from a pleading . . . any redundant, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Generally though, a motion to strike under Rule 12(f) "should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action."  5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382 (3d ed. 2008) (footnote omitted) (collecting cases).  Thus, "a motion to strike [is] frequently . . . denied when the court believes that no prejudice could result from the challenged allegations, even though the offending matter literally is within one or more of the categories set forth in Rule 12(f)."  *Id.* (collecting cases); *see also Godfredson v. JBC Legal Group, P.C.*, 387 F. Supp. 2d 543, 556-57 (E.D.N.Y. 2005) (denying motion to strike impertinent and scandalous material in complaint alleging that defendants engaged in illegal debt collection practices because

complaint would not be presented to the jury and the court assured defendants that it would not consider irrelevant allegations).

Here, Defendants point out that "GSCO[] repeatedly and calculatedly used the criminal terms 'theft' and 'stole' to describe the civil allegation that FNAWS extracted names of its own members from a list of '3/4 Slammers' printed for public consumption in GSCO's magazine." (Doc. 280 at 1.)  Defendants argue that the "[i]nclusion of such language in civil litigation in publicly filed documents wrongly and maliciously implies criminal behavior on behalf of Defendants which was neither alleged nor evidenced (and certainly not 'admitted') in this litigation." (*Id.* at 2.)  Defendants maintain that the terms have "no place" in this dispute and ask that the court enter an order "striking . . . any and all portions of GSCO's briefs containing the words . . . or otherwise implying criminal behavior." (*Id.*)  In contrast, GSCO insists that "Defendants' purposeful infringement and other unlawful actions . . . are properly characterized as acts of theft and piracy," and that "[i]n fact, the courts and Congress have used these very words to describe the type of infringement that Defendants have engaged in towards [GSCO]. (Doc. 282 at 1.)  As one example, GSCO cites the United States Court of Appeals for the Sixth Circuit's opinion in *Johnson v. Jones*, 149 F.3d 494, 520 (6th Cir. 1998) (noting that a "[trademark] infringing defendant can benefit from the plaintiff's goodwill without having to pay for it; in effect, the defendant steals the plaintiff's customers"). (Doc. 282 at 2.)  GSCO therefore requests that "Defendants' Motion to Strike be denied." (*Id.* at 4.)

95

The court agrees with GSCO and indeed finds relevant that other courts have used similar language to describe similar conduct.  But, even if the "allegations [had] no possible relation or logical connection to the subject matter of the controversy," 5C Wright & Miller, *supra*, § 1382, the court remains of the opinion that, as in *Godfredson*, the danger of prejudice to Defendants is minimal, *see Godfredson*, 387 F. Supp. 2d at 556-57.  For that reason, Defendants' Motion to Strike is due to be denied.

## F.    DEFENDANTS' MOTION TO VACATE, ALTER, OR AMEND ORDER OF AUGUST 5, 2009 REGARDING POSTING OF BOND TO REQUIRE DEFENDANTS TO POST SEPARATE BONDS (DOC. 301)

On July 31, 2009, GSCO filed an Expedited Motion for Bond, requesting that the court order Defendants to post a supersedeas bond in the full amount of the $1.9 million judgment.  (Doc. 293 at 1-2.)  The court granted the motion on August 4, 2009, and entered an order requiring Defendants "to immediately post a supersedeas bond in the principal amount of $1,900,000.00."[61]  (Doc. 295 at 2.)  The court subsequently denied Defendants' Motion for Reconsideration on August 5, 2009.  (Doc. 296; Doc. 297.)  Thereafter, on August 12, 2009, Defendants moved the court "to vacate, alter or amend its Order of August 5, 2009 [Doc. 297] to provide, consistent with the separate final judgments against them, that the Defendants do not have a joint and several obligation to obtain the bond required by the

---

[61] The judgment entered by Judge Hopkins pursuant to the jury's verdict  was in favor of GSCO and against FNAWS in the amount of $950,000.00, and in favor of GSCO and against ISHA in the amount of $950,000.00.  (Doc. 242 at 2, ¶¶ 1-2.)

Court." (Doc. 301 at 1.)  Specifically, Defendants argue that FNAWS "is not responsible for the judgment against ISHA and vice versa, and FNAWS should not be required to obtain a bond for ISHA and vice versa." (*Id.* at 2.)  GSCO, on August 18, 2009, filed an Opposition to Defendants' Motion to Vacate, Alter, or Amend Order of August 5, 2009.  (Doc. 303.)  In that response, GSCO contends, *inter alia*, that Defendants' motion "is an improper second motion for reconsideration of the Court's August 4, 2009 Bond Order (Doc. 296)."[62] (*Id.* at 1.)  Particularly, GSCO claims that "Defendants are improperly trying to relitigate the issues already decided by the Court, and Defendants are also improperly raising issues that Defendants failed to bring up and argue in a timely manner." (*Id.* at 2.)  Defendants filed a reply brief on August 18, 2009.  (Doc. 304.)  Finally, on August 28, 2009, while Defendants' motion remained pending, FNAWS posted a bond in the amount of $1,900,000.00, representing the full amount of the judgments against both FNAWS and ISHA.  (Doc. 310.)

The Eleventh Circuit has held that "'[m]otions for reconsideration should not be used to raise legal arguments which could and should have been made before judgment was issued.'" *Cruz v. Aladro*, 129 F. App'x 549, 551 (11th Cir. 2005) (quoting *Sanderlin v. Seminole Tribe of Fla.*, 243 F.3d 1282, 1292 (11th Cir. 2001).  The rule is applicable here. Defendants, as GSCO argues, had multiple opportunities to obtain or argue for separate bonds for FNAWS and ISHA, which would secure only the judgment against each entity.

---

[62] GSCO also argues, for example, that FNAWS is responsible for the judgment against ISHA because "ISHA acted at the direction and control of FNAWS in its infringement and tortious activities against [GSCO]." (Doc. 303 at 2-3, ¶ 4.)

(*See* Doc. 303.)  What's more, the court's August 4, 2009 order, which granted GSCO's

Expedited Motion for Bond, only required that "Defendants" post a bond in the amount of

$1,900,000.00.  (Doc. 295.)  The order did not differentiate between FNAWS and ISHA, and

did not require that FNAWS obtain a bond for ISHA, or vice versa.  (*Id.*)  FNAWS and ISHA

could have posted separate bonds.  (*See id.*)  And, if ISHA was unable to secure a bond

covering the judgment against it, Defendants could have raised the issue prior to having

FNAWS post a bond covering the judgment against ISHA.  Indeed, Defendants expressly

informed the court that they would "keep the Court apprised of their efforts to obtain a bond

and [would] request leave to ask for more time if necessary or to show cause why it would

be impractical or impossible to do so."  (Doc. 296 at 3 n.1.)  And though Defendants did

request an extension of time to post the bond, (Doc. 305), which the court granted, (Doc.

309), Defendants did not argue for separate bonds, or inform the court that ISHA could not

secure a bond covering the judgment against it (*see* Doc. 305).  Instead, consistent with many

of their previous arguments, Defendants treated FNAWS and ISHA as a single operation, and

FNAWS posted a bond covering the judgments against both entities.  (*See* Doc. 310; Doc.

37 at 30, ¶ 7.)  The court declines to consider Defendants' argument now, "which could and

should have been made" earlier.  *See Cruz*, 129 F. App'x at 551 (quoting *Sanderlin*, 243 F.3d

at 1292).  Therefore, the court is of the opinion that Defendants' Motion to Vacate, Alter, or

Amend Order of August 5, 2009 Regarding Posting of Bond to Require Defendants to Post

Separate Bonds is due to be denied.

**G.    GSCO'S MOTION FOR AN AWARD OF ITS ATTORNEYS' FEES (DOC. 256)**

Also before the court is GSCO's Motion for an Award of its Attorneys' Fees pursuant to Fed. R. Civ. P. 54(d)(2), section 35(a) of the Lanham Act, codified at 15 U.S.C. § 1117(a), and the Copyright Act, 17 U.S.C. § 505.  (Doc. 256.)  To be exact, GSCO requests a total of $1,337,662.15 in attorneys' fees, which represents "fees in the amount billed through January 2008 and most of that incurred as of February 25, 2008."  (*Id.* at 3.)  Also, GSCO "requests leave to file a supplemental petition for fees in connection with any post-trial motions."  (*Id.* at 4.)  With its motion, GSCO filed an accompanying brief in support.  (Doc. 257.) Defendants filed their Brief in Opposition to Plaintiff's Motion for Attorneys' Fees, (Doc. 264), and GSCO filed a reply brief, (Doc. 270).  Later, GSCO filed a Supplement to Brief in Support of Motion for an Award of its Attorneys' Fees.  (Doc. 329.)


1.    <u>STANDARD OF REVIEW UNDER RULE 54(d)(2)</u>

Rule 54(d)(2) states in pertinent part that "[a] claim for attorney's fees . . . must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages."  Fed. R. Civ. P. 54(d)(2)(A).  Subsection (d)(2)(B) adds that "the motion must . . . (ii) specify the judgment and the statute, rule, or other grounds entitling the movant to the award."  The relevant statutes in this case, as stated by GSCO, are section 35(a) of the Lanham Act and section 505 of the Copyright Act.  (Doc. 256.)

2.    ATTORNEYS' FEES UNDER THE LANHAM ACT

Section 35(a) of the Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. 1117(a).  The Eleventh Circuit has clarified that "exceptional cases are those where the infringing party acts in a 'malicious,' 'fraudulent,' 'deliberate,' or 'willful' manner." *Burger King Corp. v. Pilgrim's Pride Corp.*, 15 F.3d 166, 168 (11th Cir. 1994) (quoting H.R. Rep. No. 93-524 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7132, 7133).  *See also Lipsher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1320 (11th Cir. 2001) (holding that "the correct standard in the Eleventh Circuit [for finding an exceptional case] is fraud or bad faith"); *Burger King Corp. v. Mason*, 710 F.2d 1480, 1495 n.11 (1983) ("[T]he elements of bad faith or fraud must be present to support the grant of attorney's fees." (citing *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1169 (11th Cir. 1982))).  Still, "[a]lthough a case may rise to the level of exceptionality, the decision to grant attorney fees remains within the discretion of the trial court." *Burger King Corp.*, 15 F.3d at 168 (citing *Dieter v. B & H Indus. of S.W. Fla.*, 880 F.2d 322, 329 (11th Cir. 1989)).

Here, GSCO maintains that:

Defendants in their intentional and willful infringement, after receiving cease and desist letters, and in breach of the 2005 Agreement, is more than enough to establish an exceptional case.  Moreover, the jury's findings that defendants acted with deliberate malice (awarding punitive damages) and that defendants intentionally infringed [GSCO's] intellectual property provide ample support for an award of attorneys' fees.

(Doc. 257 at 3.)  Naturally, Defendants respond that "[t]his is not an 'exceptional' case," and assert that they "did not engage in 'passing off' [or] seek to profit from GSCO's good will," that they "have no intention of using GSCO's marks if permanently enjoined," and that "GSCO has received more than full compensation from the jury."  (Doc. 264 at 4.) Defendants add, however, that "even if this Court were to agree with GSCO that this is an 'exceptional' case, it should exercise its discretion not to award attorneys' fees to GSCO, because Defendants are non-profit organizations whose actions are not motivated by profit and whose mission is conservation of wildlife."  (*Id.* at 17.)

In support of their alternative argument, Defendants cite to the district court opinion of *Birthright v. Birthright*, 827 F. Supp. 1114 (D.N.J. 1993), insisting that the case "is precisely on point."  (Doc. 264 at 17.)  In *Birthright*, a Canadian non-profit organization engaged in pregnancy counseling services filed suit against formerly affiliated American non-profit chapters engaged in the same services, alleging trademark infringement, unfair competition, and false advertising, and requesting attorneys' fees pursuant to section 35(a) of the Lanham Act.  *Birthright*, 827 F. Supp. at 1119-21, 1144.  In the district court's findings of fact, the court found that the American chapters had continued to use the Canadian organization's registered service mark "Birthright" and "B" logo in fundraising letters, despite the Canadian organization's termination of their authority to do so.  *Id.* at 1129-33.  The court therefore held that the American chapters had "willfully and fraudulently continued to use [the marks] . . . and that [they] made such use of the name and logo in order

to take advantage of and benefit from the good will and reputation of these marks." *Id.* at

1144.  As a result, the court stated that the "matter [was] an 'exceptional' case in which

attorneys' fees may be awarded." *Id.*  However, recognizing that an award of attorneys' fees

was discretionary even in an exceptional case, the court declined to award fees, stating that:

> The court, having considered the equities of the matter, and using its sound
> discretion, holds that the present case does not warrant an award of attorneys' fees.
> In particular, the court notes that the present matter involves a dispute between non-
> profit organizations within the same social movement for control of the movement's
> name and logo.  Political and social concerns rather than profit motivated the
> principal individuals and entities.  Where a defendant's trademark violation occurs
> in a non-profit, noncommercial context, the equities favor a denial of an award of
> attorneys' fees.

*Id.* (citation omitted); *see also Lutheran Ass'n of Missionaries & Pilots, Inc. v. Lutheran*

*Ass'n of Missionaries & Pilots, Inc.*, No. Civ. 03-6173 PAM/RLE, 2005 WL 629605, at *8

(D. Minn. 2005) (agreeing with analysis in *Birthright* and finding, in the trademark

infringement dispute between two non-profit missionary associations, that the equities

favored denying an award of attorneys' fees).

GSCO argues that *Birthright* is inapposite because "Defendants' infringement was not

limited to non-commercial letters," and because "Defendants were motivated by malice and

bad faith . . . not simply by non-profit concerns of wild sheep conservation."[63]  (Doc. 257 at

---

[63] GSCO also cites to *Blum v. Stenson*, 465 U.S. 886, 894-95 (1984), for the proposition that
"the non-profit status of the *parties* or their attorneys is of no legal relevance in a fees
determination."  (Doc. 257 at 14 (emphasis added).)  As Defendants point out, GSCO's
representation of *Blum* is too broad, as well as misleading.  (*See* Doc. 264 at 19.)  In *Blum*, the
Supreme Court, interpreting the legislative history of 42 U.S.C. § 1988, which allows reasonable
attorneys' fees in federal civil rights actions, stated that attorneys' fees under the section "are to be
calculated according to the prevailing market rates in the relevant community, regardless of whether
plaintiff is represented by private or nonprofit counsel." *Blum*, 465 at 895.  Simply put, extending

14.)  In response, Defendants maintain that "[e]ven if . . . Defendants were guilty of fraud or bad faith," GSCO "cannot change the undisputed facts: Defendants are non-profit organizations and all of their activities, whether publishing, hosting conventions, or selling goods and services, are fund-raising activities for Defendants' undisputedly successful conservation programs." (Doc. 264 at 18, 20.)  The court agrees.  Simply put, while the court does find some appeal in GSCO's arguments that Defendants' infringement was intentional and willful, which in turn weighs in favor of finding an exceptional case, the court is not persuaded that attorneys' fees are due to be granted.  Indeed, as in both *Birthright* and *Lutheran Ass'n of Missionaries & Pilots, Inc.*, GSCO and Defendants are non-profit organizations with essentially identical purposes, wild sheep and goat conservation.  (*See* Doc. 25 at 4-6, ¶¶ 10-14; Doc. 37 at 29-30, ¶¶ 1-6.)  Also, and again similar to *Birthright*, GSCO and Defendants used GSCO's marks in collaboration for many years while GSCO participated in FNAWS' annual conventions, and the parties' disputes regarding the marks did not arise until GSCO decided that holding its own convention would be more profitable. (Doc. 234 at 13, ¶ 14; Def.'s Trial Ex. 115.)  Thus, as previously stated by Judge Hopkins, GSCO "has significantly contributed to any confusion over the issue of the marks through its participation at prior conventions sponsored by [FNAWS] and otherwise."  (*See* Doc. 91

---

*Blum* to mean that the non-profit status of the *parties* is of no legal relevance in awarding fees is beyond its express or implicit holding.

at 12.)  Therefore, exercising its discretion, the court finds that GSCO's Motion for an Award

of its Attorneys' Fees under section 35(a) of the Lanham Act is due to be denied.[64]

### H.    GSCO'S PETITION FOR COSTS OF SUIT (DOC. 258)

In entering judgment, Judge Hopkins specifically taxed costs against Defendants.

(Doc. 242 at 2.)  As a result, pursuant to Fed. R. Civ. P. 54(d)(1), (d)(2)(A), section 35(a) of

the Lanham Act, codified at 15 U.S.C. § 1117(a), and the Copyright Act, 17 U.S.C. § 505,

GSCO petitioned the court "for cost of suit in the amount of $45,618.32."  (Doc. 258 at 1.)

In the petition, GSCO also noted that it "reserves the right to supplement its petition with

recent or future costs that may have been or will be incurred, but that are not sought herein."

(*Id.* at n.1.)  Defendants filed a response to GSCO's petition.  (Doc. 263.)

### 1.    STANDARD OF REVIEW UNDER RULE 54(d)(1) AND 54(d)(2)(A)

Rule 54(d)(1) sets out the general procedure for awarding costs under the Federal

Rules, stating that "[u]nless a federal statute, these rules, or a court order provides otherwise,

---

[64] For the same reasons, the court likewise finds that GSCO's motion for attorneys' fees under the Copyright Act, 17 U.S.C. § 505, is due to be denied.  Particularly, although GSCO is correct that "there is no need for a finding that this is an exceptional case to award fees under the Copyright Act," and that they are routinely awarded to a prevailing party, (Doc. 257 at 10), the decision to award attorneys' fees under the Copyright Act remains in the discretion of the court, 17 U.S.C. § 505.

costs–other than attorney's fees–should be allowed to the prevailing party."[65]  Fed. R. Civ.

P. 54(d)(1).  Subsection (d)(2)(A) adds that "[a] claim for . . . nontaxable expenses must be

made by motion," and that, under subsection (d)(2)(B), "the motion must . . . (ii) specify the

judgment and the statute, rule, or other grounds entitling the movant to the award."  Congress

has provided that the following expenses may be taxed as costs:

> **(1)** Fees of the clerk and marshal;
> **(2)** Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
> **(3)** Fees and disbursements for printing and witnesses;
> **(4)** Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
> **(5)** Docket fees under section 1923 of this title;
> **(6)** Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

 28 U.S.C. § 1920.  In addition, § 1924 requires that:

> Before any bill of costs is taxed, the party claiming any item of cost or disbursement shall attach thereto an affidavit, made by himself or by his duly authorized attorney or agent having knowledge of the facts, that such item is correct and has been

---

[65] Although Defendants are correct that "Rule 54(d) . . . places the taxing of costs within the sound discretion of the trial court," (Doc. 263 at 1 (citing *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987))), the Eleventh Circuit has clarified that, "[u]nder Rule 54(d), there is a strong presumption that the prevailing party will be awarded costs," *Matthews v. Crosby*, 480 F.3d 1265, 1276 (11th Cir. 2007) (citing *Arcadian Fertilizer, L.P. v. MPW Indus. Servs., Inc.*, 249 F.3d 1293, 1296 (11th Cir. 2001)).  Neither section 35(a) of the Lanham Act, 15 § U.S.C. 1117(a), nor the Copyright Act, 17 U.S.C. § 505, alter this presumption. *See, e.g.*, *Prot. One Alarm Monitoring, Inc. v. Executive Prot. One Sec. Serv., LLC.*, 553 F. Supp. 2d 201, 210 (E.D.N.Y. 2008) ("Courts generally award costs to prevailing parties in cases involving violations of the Lanham Act." (citing *Tri-Star Pictures, Inc. v. Unger*, 42 F. Supp. 2d 296, 306 (S.D.N.Y. 1999))); *Atl. Recording Corp. v. Carter*, 508 F. Supp. 2d 1019, 1027 (S.D. Ala. 2007) ("[C]ourts have routinely awarded costs to the prevailing party in copyright cases." (citing *Arclightz & Films Pvt. Ltd. v. Video Palace Inc.*, 303 F. Supp. 2d 356, 365 (S.D.N.Y. 2003))).  And, at any rate, as stated above, Judge Hopkins already determined to tax costs against Defendants.  (*See* Doc. 242 at 2).

necessarily incurred in the case and that the services for which fees have been charged were actually and necessarily performed.

28 U.S.C. § 1924.

Although "case law is clear . . . that 'costs' under § 1117(a) [of the Lanham Act] include, at a minimum, those costs specifically enumerated in 28 U.S.C. § 1920," *e.g.*, *Tony Jones Apparel, Inc. v. Indigo USA LLC*, No. 03 C 0280, 2005 WL 3115234, at *3 (N.D. Ill. Nov. 16, 2005) (citing *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 370 (4th Cir. 2001), courts are divided as to whether the Lanham Act allows a prevailing party to recover "other costs besides those listed in § 1920," *compare id.* (stating that, under the Lanham Act, "the court has the discretion to award costs beyond those specifically enumerated in § 1920"), *with Powerhouse Marks LLC v. Ci Hsin Impex, Inc.*, 463 F. Supp. 2d 733, 740 (E.D. Mich. 2006) ("[C]osts [under the Lanham Act] should be limited to those specified in Section 1920 . . . .").[66]  And, while the Eleventh Circuit has not decided this specific issue, at least one district court in this circuit has determined that "because 15 U.S.C. § 1117(a) does not specify which costs are recoverable, [district courts are] 'bound by the limitations set out in 28 U.S.C. §§ 1821 and 1920.'"[67]  *Jackson v. Grupo Indus. Hotelero, S.A.*, No. 07-22046-CIV, 2010 WL 750301, at *5 (S.D. Fla. Mar. 3, 2010) (citing *Crawford*

_____

[66] It is relevant to point out that even those courts that allow a prevailing party to recover "other costs" agree that, in awarding such costs, a court's "discretion should be used carefully." *E.g.*, *Tony Jones Apparel, Inc.*, 2005 WL 3115234, at *3.

[67] 28 U.S.C. § 1821 sets limits on the amount a federal court may reimburse a prevailing party regarding witness fees.  *Morrison v. Reichhold Chems., Inc.*, 97 F.3d 460, 463 (11th Cir. 1996).

*Fitting Co.*, 482 U.S. at 445).[68]  The court will address the expenses requested by GSCO,

which Defendants have disputed,[69] categorically.

2.      GSCO'S REQUESTED COSTS

a.      *Fees of the Clerk and Marshall*

As well as the $350.00 filing fee, *see supra* note 69, GSCO also asks that the court

tax as costs against Defendants "$150.00 in fees paid to the clerk that accompanied three

motions for *pro hac vice* admission."  (Doc. 258 at 3.)  In response, Defendants argue that

"it has been held that *pro hac vice* fees are not authorized by 28 U.S.C. § 1920, and thus are

not recoverable as costs."  (Doc. 263 at 3 (citation omitted).)

---

[68] Although the Copyright Act "allow[s] the recovery of full costs," subject to the court's discretion, 17 U.S.C. § 505, the Eleventh Circuit, in *Artisan Contractors Ass'n of America, Inc. v. Frontier Insurance Co.*, nonetheless agreed that "'full costs' . . . does not constitute clear, explicit or plain evidence of 'congressional intent to treat 17 U.S.C. § 505 costs differently from costs authorized in other statutes,'" 275 F.3d 1038, 1040 (11th Cir. 2001) (quoting *Pinkham v. Camex, Inc.*, 84 F.3d 292, 295 (8th Cir. 1996)).  Thus, in that case, the Eleventh Circuit declined to award witness fees in excess of that available under 28 U.S.C. § 1821(b).  *Id.*

[69] As to the expenses that Defendants have not disputed, because GSCO has, by affidavit, verified the accuracy and necessity of the expenses, (*see* Doc. 258 at Ex. A & Ex. C), and given that each expense is expressly authorized by § 1920, the court finds that these expenses are due to be taxed as costs against Defendants.  As a result, GSCO's Petition for Costs of Suit is due to be granted with respect to the following expenses: the $350.00 filing fee; the $208.00 in costs associated with service of the summons and complaint and a subpoena; the $1,439.28 in costs incurred in obtaining transcripts from the August 17 and 19, 2007 hearings, the September 29, 2007 hearing, and the October 25, 2007 hearing; the $485.00 fee for expedited trial transcripts; and the $20.00 docket fee.  (*See id.* at 3, 6-9.)  Accordingly, in addition to those disputed costs that are due to be taxed against Defendants, *see infra* Part II.H.2, the court will tax Defendants an additional $2,502.28, representing the sum of the foregoing expenses.

Although some authority exists to the contrary, *see Davis v. Puritan-Bennett Corp.*, 923 F. Supp. 179, 181 (D. Kan. 1996) (finding $40.00 fee for *pro hac vice* admission appropriate under § 1920(1)), the court agrees with those courts that deny applications for costs related to *pro hac vice* motions, *see Cathey v. Sweeney*, No. CV205-202, 2007 WL 1385657, at *1 (S.D. Ga. May 8, 2007) ("The pro hac vice fee is an expense of counsel, not the client, and is thus not recoverable."); *Eagle Ins. Co. v. Johnson*, 982 F. Supp. 1456, 1459-60 (M.D. Ala. 1997), *aff'd mem.*, 162 F.3d 98 (11th Cir. 1998); *see also Beck v. Prupis*, 162 F.3d 1090, 1100 (11th Cir. 1998) (finding that district court did not abuse discretion in declining to tax court costs associated with appearing *pro hac vice*); *Air Turbine Tech., Inc. v. Atlas Copco AB*, No. 01-8288-CIV, 2008 WL 544731, at *3 (S.D. Fla. 2008) ("[The prevailing parties] chose to retain out-of-state counsel when able and competent local counsel was available to defend the case.  The cost of [the prevailing parties'] choice should not be bourne by the non-prevailing party.").  GSCO's Petition for Costs of Suit, (Doc. 258), is therefore due to be denied as to the $150 in fees associated with the motions for *pro hac vice* admission.

b.   *Fees for Printed or Electronically Recorded Transcripts Necessarily Obtained for Use in the Case*

GSCO next requests that the court tax Defendants "court reporter costs in the total amount of $11,117.78 for depositions."  (Doc. 258 at 6.)  Specifically, GSCO seeks reimbursement of "$2,595.65, incurred on September 24, 2007, for the transcripts of the

depositions of Dale Martin, Butch Kuflak, and Dennis Campbell," "$7,266.13, also [incurred] on September 24, 2007, for court reporter costs for the depositions of Dale Martin, Butch Kuflak, and Dennis Campbell,"[70] and "$1,256 for two depositions on October 4, 2007." (*Id.* at 5.)

To be sure, "[t]axation of deposition costs is authorized by § 1920(2)." *U.S. E.E.O.C. v. W & O, Inc.,* 213 F.3d 600, 620 (11th Cir. 2000) (citing *United States v. Kolesar*, 313 F.2d 835, 837-38 (5th Cir. 1963)). However, "'[w]here the deposition costs were merely incurred for convenience, to aid in thorough preparation, or for purposes of investigation only, the costs are not recoverable.'" *Id.* (quoting *Goodwall Const. Co. v. Beers Const. Co.*, 824 F. Supp. 1044, 1066 (N.D. Ga. 1992), *aff'd*, 991 F.2d 751 (Fed. Cir. 1993)). Thus, "[t]he question of whether the costs for a deposition are taxable depends on the factual question of whether the deposition was wholly or partially "'necessarily obtained for use in the case.'" *Id.* at 620-21 (quoting *Newman v. A.E. Staley Mfg. Co.*, 648 F.2d 330, 337 (5th Cir. Unit B 1981)).

Defendants object to the $11,117.78 in deposition costs sought by GSCO, noting that "GSCO's records are inaccurate or incomplete and its attempt to reconstruct them and fill in the gaps is highly unreliable." (Doc. 263 at 7.) Defendants claim that the court should not "be expected to find that a given cost was reasonable or necessary when that cost cannot even

---

[70] Within its description of the $7,266.13 expense, GSCO included a notation reading: "**[UNCLEAR FROM SEED COSTS – IF THESE WERE TAKEN IN DENVER, THIS SHOULD BE RIGHT]**." (Doc. 258 at 5.)

be properly identified." (*Id.* at 7.)  For example, regarding the $7,266.13 expense incurred

"on September 24, 2007, for court reporter costs for the depositions of Dale Martin, Butch

Kuflak, and Dennis Campbell," Defendants point out that, in looking at Seed Intellectual

Property Law Group's ("Seed") records, the relevant entry reads only: "Court reporter's costs

in Denver, CO, Hunter & Geist."  (*Id.* at 5-6 (citing Doc. 258, Ex. C at Ex. 1).)  Defendants

assert that "[t]he depositions of Dale Martin, Butch Kuflak, and Dennis Campbell did not

take place in Denver," but "[r]ather they took place in Seattle, Washington, on September 17,

18, and 19."  (*Id.* at 6 (citation omitted).)  Further, Defendants argue that, "[i]n a more

serious error, those depositions were noticed and taken by Defendants, who arranged for and

compensated the court reporter."  (*Id.* (citation omitted).)

    While Defendants are correct regarding the depositions of Dale Martin, Butch Kuflak,

and Dennis Campbell, a review of the record evidences that the $7,266.13 expense refers to

the depositions of Ray Lee, John Babler, and Ronald Roderick.  (*See* Doc. 111, Ex. A at Ex.

1; Doc. 148 at Exs. 1 & 2.)  Each of these depositions took place in Denver, Colorado, with

Hunter & Geist, Inc. serving as the court reporting firm.  (*See* Doc. 111, Ex. A, Ex. 1 at 2;

Doc. 148, Ex. 1 at 1, Ex. 2 at 1.)  Further, while none of these individuals' deposition

occurred on September 24, 2007, the court finds that the September 24, 2007 date refers not

to when the depositions took place, but instead when Seed paid the expenses.  Indeed, the

depositions all occurred shortly prior to September 24, 2007.  (*See* Doc. 111, Ex. A, Ex. 1

at 2; Doc. 148, Ex. 1 at 1, Ex. 2 at 1.)  And, because Defendants listed both Ray Lee and John

Babler on their witness list, (*see* Doc. 149 at 1-2), and given that Defendants designated all

110

three in response to GSCO's Fed. R. Civ. P. 30(b)(6) deposition notices, the court finds that these depositions were "necessarily obtained for use in the case," *see* § 1920(2); *see also W & O, Inc.,* 213 F.3d at 621 ("Taxation of deposition costs of witnesses on the losing party's witness list is reasonable because the listing of those witnesses indicated . . . that 'the information those people had on the subject matter of this suit was not so irrelevant or so unimportant that their depositions were outside the bound of discovery.'" (quoting *Murphy v. City of Flagler Beach*, 761 F.2d 622, 631 (11th Cir. 1985))).  GSCO's Petition for Costs of Suit, (Doc. 258), is therefore due to be granted as to the $7,266.13 expense relating to the depositions of Ray Lee, John Babler, and Ronald Roderick.

However, as to the $2,595.65 expense "for the transcripts of the depositions of Dale Martin, Butch Kuflak and Dennis Campbell," and regarding the $1,256.00 cost "for two depositions," the court agrees that GSCO's explanation of the expenses, and Seed's records, are too incomplete and speculative for GSCO to meet its burden under § 1920(2).  For instance, with respect to the $1,256.00 expense "for two depositions," as Defendants insist, GSCO's Petition "provides no detail as to who was deposed, where, or when," (Doc. 263 at 6), and while the court could presume the expense relates to the deposition of Steve Davis and Hugh Jacks, without any specifically supportive evidence, the court declines.  Also, while the court would be inclined to find that the transcript of the deposition of Dennis Campbell was "necessarily obtained for use in the case," because, *inter alia*, Defendants listed Mr. Campbell on their witness list, (Doc. 149 at 1), GSCO has offered nothing to establish the necessity of obtaining the transcripts of the depositions of Dale Martin and

111

Butch Kuflak.  Defendants did not list either on their witness list, nor did either testify at trial.  So, because GSCO has wholly failed to establish the necessity of the costs associated with these two deponents, and because it has included the costs associated with obtaining their transcripts with the cost of obtaining the transcript of Dennis Campbell, such that the court cannot separate out the expenses, (*see* Doc. 258 at 5, Ex. C, Ex. 1 at 1), the court finds that GSCO's Petition for Costs of Suit, (Doc. 258), is due to be denied as to $2,595.65 expense for transcripts, as well as the $1,256.00 cost for two depositions.  However, the court will allow GSCO to file a Supplemental Petition for Costs of Suit to seek recovery for the cost of obtaining the transcript of Dennis Campbell, assuming GSCO is able to verify what portion of the $2,595.65 expense represents the cost of obtaining Mr. Campbell's transcript.

c.      *Fees and Disbursements for Printing and Witnesses*

Under § 1920(3), GSCO requests that the court tax as costs against Defendants $43.88, which GSCO asserts it incurred as witness fees with respect to Blaine Allen.  (Doc. 258 at 7.)  In response, Defendants point out that Mr. Allen "is a former secretary of ISHA, and was Defendants' witness at trial."  (Doc. 263 at 7.)  Defendants assert that they "are at a loss as to how GSCO incurred a 'witness fee' for Blaine Allen, and should not be required to guess – nor should the Court."  (*Id.*)  The court agrees.  Given Seed's records, the court is unable to determine what the $43.88 represents.  (*See* Doc. 258, Ex. C at Ex. 1.)  And, while $40.00 of the total may well represent the witness fee for one day's attendance at trial, *see* § 1821(b), the court will not speculate.  As a result, GSCO's Petition for Costs of Suit

112

is due to be denied as to the $43.88 witness fee for Mr. Allen.  Again, however, the court will allow GSCO to file a Supplemental Petition for Costs of Suit to recover the $43.88 fee, assuming GSCO is able to verify what the fee actually represents.

d.      *Fees for Exemplification and the Costs of Making Copies of any Materials where the Copies are Necessarily Obtained for Use in the Case*

Next, pursuant to § 1920(4), GSCO seeks to tax as costs against Defendants a total of $14,722.60 for "copying costs."  (Doc. 258 at 8.)  The total includes $6,524.43 for "[c]opies of documents for production," $6,582.53 for "[c]opies of trial exhibits," $1,336.24 for the "[c]ost of electronically imaging trial exhibits for use as visual aid at trial," and $279.40 for the "[c]ost of oversize 'blow-ups' of certain documents for trial."  (*Id.*)

As stated by the Eleventh Circuit, "[f]or costs to be taxed under § 1920(4), an item must fit within either the category 'copies of paper' or the category 'exemplification.' [The Eleventh Circuit] read[s] 'copies of paper' to mean reproductions involving paper in its various forms . . . ."  *Arcadian Fertilizer, L.P.*, 249 F.3d at 1296.  "[T]he term 'exemplification' imports the legal meaning of '[a]n official transcript of a public record, authenticated as a true copy for use as evidence.'"  *Id.* at 1297 (quoting *Black's Law Dictionary* 593 (7th ed. 1999)).  "[I]n evaluating copying costs, the court should consider whether the prevailing party could have reasonably believed that it was necessary to copy the papers at issue."  *W & O, Inc.,* 213 F.3d at 623.  "'Copies attributable to discovery' are a category of copies recoverable under § 1920(4)."  *Id.* (quoting *Desisto College, Inc. v. Town*

113

*of Howey-in-the-Hills*, 718 F. Supp. 906, 913 (M.D. Fla. 1989).  However, the Eleventh Circuit has made clear that "[physical] exhibit costs [i.e. charts and models] are not taxable because there is no statutory authorization."  *See id.* (footnote omitted); *see also Arcadian Fertilizer, L.P.*, 249 F.3d at 1296-98 ("[I]n [the Eleventh Circuit], physical exhibits like models and charts simply may not be taxed as costs because there is no statutory authorization." (citing *W & O, Inc.*, 213 F.3d at 623)).

Addressing first the $6,524.43 expense incurred for "[c]opies of documents for production," (Doc. 258 at 8), as noted above, this expense is taxable under § 1920(4), *W & O, Inc.*, 213 F.3d at 623.  As GSCO notes, it incurred these costs "in response to Defendants' requests for production," (Doc. 258 at 8), and counsel for GSCO has, by affidavit, represented that these expenses were "necessarily incurred in this case," (*id.*, Ex. C at 1). Given the complexity of the case, the court agrees; GSCO's Petition for Costs of Suit is due to be granted as to the $6,524.43 expense for copies attributable to discovery.

Second, regarding the $6,582.53 cost for "[c]opies of trial exhibits," (*id.* at 8), to the extent this expense actually represents "copies of paper," it is likewise taxable, *Arcadian Fertilizer, L.P.*, 249 F.3d at 1296.  Indeed, in that Judge Hopkins ordered the parties to exchange trial exhibits, (*see* Doc. 224 at 1), the court finds that this expense was necessarily incurred.[71]  However, GSCO has included in the $6,582.53 total, $220.00 for "3" THREE-

---

[71] While Defendants insist that they "should not bear the full expense of [GSCO's trial exhibit copying costs], especially where GSCO only offered 103 total exhibits at trial," (Doc. 263 at 10), the court disagrees.  As stated by the Eleventh Circuit, "'[u]se of information contained in a file is not a prerequisite to finding that it was necessary to copy the file.'" *W & O, Inc.*, 213 F.3d at 623 (quoting *Cengr v. Fusibond Piping Sys.*, 135 F.3d 445, 455 (7th Cir. 1998)).  Instead,

RING BINDING," $1,141.80 for "MANILA FOLDERS," $266.42 for "HAND TYPED TABS" and $598.41 in "SALES TAX." (*See* Doc. 258, Ex. A at Ex. 1.)  Because these expenses do not fall within § 1920(4), they are not recoverable. *Preis v. Lexington Ins. Co.*, No. 06-0360-WS-C, 2007 WL 3120268, at *5 (S.D. Ala. Oct. 22, 2007) (declining to include the cost of index tabs, binders, and sales tax within the term "[c]opies of paper" (quoting *Arcadian Fertilizer*, 249 F.3d at 1296)).  As such, GSCO's Petition for Costs of Suit, (Doc. 258), is due to be granted as to the $4,355.90 expense for "HAND FED COPIES," (*id.*, Ex. A at Ex. 1), but denied as to the remaining four expenses.

Next, with respect to the $1,336.24 "[c]ost of electronically imaging trial exhibits for use as visual aid at trial," (Doc. 258 at 8), Defendants argue that "GSCO's electronic imaging was not a reproduction of paper," "is not authorized by . . . § 1920, and is thus not taxable," (Doc. 263 at 8-9).  Additionally, Defendants maintain that, "[e]ven if susceptible to appropriate categorization," GSCO's "[e]lectronic imaging was a convenience, not a necessity." (*Id.* at 9.)  Simply put, because the court agrees that GSCO incurred the $1,336.24 "[c]ost of electronically imaging trial exhibits" as a mere convenience of counsel, or, as GSCO itself acknowledges, because the exhibits "made the trial significantly less difficult for Grand Slam's counsel," (Doc. 258, Ex. A at 2), the court finds that "it was [not] necessary to copy the papers at issue," *W & O, Inc.*, 213 F.3d at 623; *cf. Arcadian Fertilizer,*

---

"'[p]hotocopying costs may be recovered even though the underlying document was not admitted at trial.'" *Id.* (quoting *United States ex rel. Evergreen Pipeline Const. Co. v. Merritt Meridian Const. Corp.*, 95 F.3d 153, 173 (2d Cir. 1996)).

*L.P.*, 249 F.3d at 1297-98 ("Until Congress sees fit to amend the language of § 1920 to include the innovative technologies currently used in the production of demonstrative exhibits, computer animations and videotape exhibits are not taxable because there is no statutory authority." (citing *W & O, Inc.*, 213 F.3d at 623)).  GSCO's Petition for Costs of Suit is thus due to be denied as to the $1,336.24 electronic imaging costs.

Lastly, concerning the $279.40 expense for "oversize 'blow-ups' of certain documents for trial," (Doc. 258 at 8), as GSCO correctly notes, "the Eleventh Circuit has concluded that 'oversize documents and color photographs are capable of th[e] characterization' ['reproductions involving paper in its various forms']," (*id.* at 7 (quoting *Arcadian Fertilizer, L.P.*, 249 F.3d at 1296)).  Accordingly, GSCO's Petition is due to be granted as to the $279.40 "[c]ost of oversize 'blow-ups.'"

e.     *Other Costs*

Finally, GSCO asks that the court tax against Defendants $17,081.78 in "other costs," consisting of $13,467.36 in "travel expenses," and $3,614.42 for "air courier costs."  (Doc. 258 at 9-10.)  GSCO argues that these expenses fall within the "'other costs' line for itemizing additional expenses incurred on Form 133 [i.e. the Bill of Costs form]," and points to the Eleventh Circuit's opinion in *Cullens v. Georgia Department of Transportation*, 29 F.3d 1489, 1495 (11th Cir. 1994), as support.  (*Id.* at 9 & Ex. B.)  The court finds GSCO's arguments in favor of recovering these costs to be unpersuasive.  As Defendants point out, (Doc. 263 at 10-11), although the Eleventh Circuit in *Cullens* did specify that "travel

expenses are appropriate expenses under § 1920 to the extent they are reasonable," the court did so pursuant to 42 U.S.C. § 1988, i.e. the statutory provision that allows for recovery of attorney's fees in civil rights cases, *see* 29 F.3d at 1495.  Indeed, in awarding reasonable travel expenses in *Cullens*, the Eleventh Circuit cited as authority its earlier opinion of *Dowdell v. City of Apopko*. *Id.*  In that case, the Eleventh Circuit specifically stated that "all reasonable expenses incurred in case preparation, during the course of litigation, or as an aspect of settlement of the case may be taxed as costs *under section 1988*."  *Dowdell*, 698 F.2d 1181, 1192 (11th Cir. 1983) (emphasis added).  Thus, the court agrees with Defendants that GSCO's reliance on *Cullens* is "inapplicable."  (Doc. 263 at 10.)

In the instant case, unlike civil rights cases, neither the Lanham Act, nor the Copyright Act, specifically allow for the recovery of costs beyond those specified under 28 U.S.C. § 1920.  *See* 15 U.S.C. 1117(a); 17 U.S.C. § 505.  And, while the Eleventh Circuit has not specifically addressed this issue by interpreting the Lanham Act's allowance for the recovery of "the costs of the action," 15 U.S.C. § 1117(a), the Eleventh Circuit has addressed the issue under the Copyright Act, which, as aforementioned, *see supra* note 68, allows for the recovery of "full costs," 17 U.S.C. § 505.  Because the Eleventh Circuit held that "'full costs' . . . does not constitute clear, explicit or plain evidence of 'congressional intent to treat 17 U.S.C. § 505 costs differently from costs authorized in other statutes," and thus denied recovery of costs beyond that authorized under § 1920, *see Artisan Contractors*, 275 F.3d at 1040, this court finds that the Eleventh Circuit would likely interpret the "costs" language of the Lanham Act in the same manner.  Thus, whether under the Lanham Act or the

117

Copyright Act, the court is of the opinion that GSCO's request for "other costs" is not authorized by § 1920.  *See Jackson*, 2010 WL 750301, at *5.  Therefore, GSCO's Petition for Costs of Suit, (Doc. 258), is due to be denied as to the $17,081.78 in travel expenses and air courier costs.

3.      GSCO'S RECOVERABLE COSTS

In sum, GSCO's Petition is due to be granted as to the following disputed costs: the $7,266.13 expense relating to the depositions of Ray Lee, John Babler, and Ronald Roderick, the $6,524.43 cost for copies attributable to discovery, the $4,355.90 expense for hand fed copies associated with trial exhibits, and the $279.40 cost of oversize blow-ups.  GSCO's Petition is likewise due to be granted as to the $2,502.28 in undisputed costs, *see supra* note 69, but is due to be denied as to the remaining expenses.  A total of $20,928.14 is therefore due to be taxed as costs against Defendants.  GSCO may, however, file a Supplemental Petition for Costs of Suit with respect to the cost of obtaining the transcript of Dennis Campbell, as well as the witness fee for Blaine Allen.

III.  **CONCLUSION**

For the foregoing reasons, the court is of the opinion that Defendants' Post-Judgment Motion Pursuant to Rule 60, (Doc. 249), is due to be denied, its Post-Judgment Motion Pursuant to Rule 62, (Doc. 249), is due to be denied as moot, its Post-Judgment Motion Pursuant to Rule 50, (Doc. 259), is due to be denied, its Post-Judgment Motion Pursuant to

Rule 59, (Doc. 259), is due to be denied, its Motion to Strike, (Doc. 280), is due to be denied, and its Motion to Vacate, Alter, or Amend Order of August 5, 2009 Regarding Posting of Bond to Require Defendants to Post Separate Bonds, (Doc. 301), is due to be denied.

Furthermore, GSCO's Motion for an Award of its Attorneys' Fees, (Doc. 256), is due to be denied, and its Petition for Costs of Suit, (Doc. 258), is due to be granted in part and denied in part.   An Order in conformity with this Memorandum Opinion will be entered contemporaneously.

**DONE**, this the 22nd day of September, 2010.


_Sharon Lovelace Blackburn_
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE